266 F.2d 769
 75 A.L.R.2d 1296
 OFFSHORE COMPANY and The Fidelity & Casualty Company of New
York, Appellants- Appellees,
v.
Johnie M. ROBISON, Appellee-Appellant.
ROBISON
v.
OFFSHORE COMPANY and The Fidelity & Casualty Company of New York.
 No. 17445.
 United States Court of Appeals Fifth Circuit.
 April 30, 1959.
 
 Donald v. Organ, New Orleans, La., Seale, Kelton & Hayes, Baton Rouge, La., of counsel, for appellee-appellant.
 Maurice J. Wilson and Breazeale, Sachse, Wilson & Hebert, Baton Rouge, La., for appellants-appellees.
 Before RIVES, CAMERON and WISDOM, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 This case propounds a riddle: When is a roughneck a seaman? The complainant offers the solution: under the Jones Act-- when the roughneck is injured while working as a member of a drilling crew on a mobile drilling platform towed to a well located in navigable waters. Respondents have no patience with conundrums: an oil worker on a rig firmly planted on the floor of the Gulf of Mexico is not a seaman, not on a vessel, and not entitled to the benefits of the Jones Act. When the facts are clear, as in this case, so respondents contend, litigants should not be exposed to the risk of a capricious jury finding that an ordinary oil worker is a Jones Act seaman simply because he is employed on an offshore drilling barge in a capacity that contributes to the accomplishment of the barge's mission.
 
 
 2
 The Jones Act gives a 'seaman' (not defined) the right to sue in an action at law for damages arising from the negligence of the owner or personnel of a 'vessel' aboard which the seaman is employed.[1] The reach of the Jones Act is a peril of the sea that could hardly have been dreamt of by the landlubbers in the oil business. The Act has always been construed liberally, but recent decisions have expanded the coverage of the Jones Act to include almost any workman sustaining almost any injury while employed on almost any structure that once floated or is capable of floating on navigable waters.[2] Our decision on this appeal turns on an examination of these cases and the applicability of their rationale to the facts before us.
 
 I.
 
 3
 Johnie Robison was an oil field worker. The complaint alleges that in August, 1956, Offshore Company hired him as a member of the crew of the vessel 'Offshore No. 55'. Offshore Company says that he was hired as a roustabout at $1.96 an hour. A roustabout is a general handyman in the oil fields, subject to any handyman in the oil fields, subject to any At the time of the accident resulting in this litigation Robison was working as a roughneck. A roughneck is a driller's helper, a laborer in a drilling crew who does the hard general work in the rigging and drilling of a well. Robison had never worked as a seaman on board a vessel, as the terms 'seaman' and 'vessel' are ordinarily understood. He had never carried seaman's papers, and none of the oil crew carried seaman's papers as a condition of employment.
 
 
 4
 Offshore Company is in the business of drilling and exploring for oil and gas, especially in the Gulf of Mexico. It owns and operates a drilling rig identified as 'Offshore No. 55'. This is a rig mounted on what Offshore calls a mobile drilling platform and what Robison calls a barge. At the time of the accident it was resting firmly on the bottom of the Gulf of Mexico, about three miles from the Texas coast. It is 200 feet long, 104 feet wide, and 15 feet deep. It was built by the American Bridge Shipyards. Offshore No. 55 has a raked bow and carries navigation lights, bitts, anchors, bilge pumps, and cranes. It has only a top deck and a lower hull. The hull could not be used for cargo; the barge is strictly a drilling platform. It has no engines, and is moved by tugs from one well location in the Gulf to another. It has living quarters for the crew and a galley in a two story house on top of the deck. Six life rafts are carried, each capable of holding ten men. Regular abandon-ship drills were held aboard Offshore No. 55. Its lifesaving gear was approved by the Coast Guard.
 
 
 5
 Retractable legs are the distinctive feature of Offshore No. 55. These are eight legs or towers, caissons, twelve feet in diameter, running through the hull, two located on each of the four corners of the barge. When the drilling barge is in position the legs are dropped down to the ocean floor, then hydraulic jacks lift the barge above the water level so that the main deck of the barge may serve as a drilling platform. When the drilling barge is in a floating position, the spuds are recessed so that the barge will have a flat bottom.
 
 
 6
 The men employed on Offshore No. 55 work ten days on and five days off. The crew remains aboard the vessel when it is moved to well locations. While the vessel is moving, roustabouts and roughnecks prepare the machinery for a new location, secure the pipe and other material on deck, chip rust, paint, wash down decks, catch lines from vessels coming alongside, operate bilge pumps, load and unload supplies.
 
 
 7
 On the night of the accident, Robison was working on the main deck of the barge. Other workmen were running casing on the drilling floor, twelve feet above the main deck. When casing was needed, it was rolled onto a catwalk, extending from the main deck to the drilling floor in a slanted position, and was pulled up to the drilling floor with the use of an air hoist line through V-doors in the side of the derrick. Robison's job was to crease the threaded ends of the drill casing and to hook the air hoist line onto the sections to be hoisted into the derrick on the drilling floor. Usually chain stoppers are placed across the catwalk to stop the pipe from sliding back down to the main deck. Usually, too, an oil line from the top of the derrick is secured to the casing after the air hoist line pulls it through the V-doors at which time the air hoist line is released and the oil line carries the casing up into the derrick itself.
 
 
 8
 At the time of the accident there was no chain stopper and the oil line was being used in another operation. One of the sections of casing was hoisted into the V-doors. A casing crew man took off the air hoist line leaving the casing unsecured. Forty feet of pipe, weighing 1620 pounds, slid, skidded, and catapulted down through the V-doors to the catwalk toward Robison. In attempting to escape, Robison caught his foot between a section of drill pipe and a beam. The casing struck the pipe, severely fracturing Robison's leg.
 
 
 9
 Robison sued the Offshore Company and its liability insurer, Fidelity and Casualty Company of New York on the theory that Robison was a seaman and a member of the crew of the vessel 'Offshore No. 55'; as such, respondent owed him the duty to provide a safe and seaworthy vessel, under the Jones Act and the general maritime law. Robison alleged that the accident was caused by unsafe working conditions, unsafe lighting, defective equipment, the absence of a proper chain stopper, and the negligent management of the equipment. In addition to damages for his injury, he claimed maintenance and cure at eight dollars a day for the period of his disability. Respondents denied that Robison was a seaman and that Offshore No. 55 was a vessel: he was a member of a drilling crew who did nothing to assist in the navigation, maintenance or operation of Offshore No. 55; there is no such thing as a 'crew of the vessel' in connection with Offshore No. 55, as that phrase is ordinarily known and related to a vessel in navigation. The respondents alleged that Robison was guilty of contributory negligence. Respondents pleaded that they had paid Robison $54 a week during his disability and that all expenses for medical care had been paid.
 
 
 10
 The plaintiff filed an amended complaint seeking to join as a party defendant the Oil City Casing Crews Company and alleged that this company had at the time of the accident a casing crew on the floor of the Offshore No. 55 whose negligence contributed to the accident. Oil City Casing Crews was not actually before the court.
 
 
 11
 The case was heard before a jury as an action under the Jones Act and the general maritime law. At the conclusion of the evidence, respondents moved for a directed verdict.[3] The motion was denied. The case was submitted to the jury on special interrogatories.[4] Judgment was entered for the plaintiff for $2250, consisting of the $3000 damages found by the jury less 25% for the complainant's contributory negligence. The motion for judgment for maintenance was allowed to the extent of 116 days at $8 a day ($919) subject to a previous payment of $878.10. The Court denied defendants' motion for a judgment NOV. Defendants appealed from the final judgment of the lower court. The plaintiff appealed from the order denying a motion for a new trial on quantum only.
 
 II.
 
 12
 There are two aspects to the question at issue: (1) What is required in law to constitute a maritime worker a seaman and a member of a crew? (2) In the circumstances of this case, is the question one for the court or for the jury?[5]
 
 
 13
 The Jones Act was adopted in 1920. It applies in terms to 'any seaman who shall suffer personal injury in the course of his employment.' It has always been interpreted broadly. Thus, in 1926, Mr. Justice Holmes, for the Supreme Court, held that a stevedore was a seaman under the Jones Act. 'Words are flexible', the work of a stevedore is 'a maritime service formerly rendered by the ship's crew', and Congress wanted to protect men engaged in the same maritime duties whether employed by a stevedore or a ship. International Stevedoring Co. v. Haverty, 1926, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157.
 
 
 14
 In 1927, partly as a result of Haverty, Congress adopted the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, 33 U.S.C.A. 901 et seq., covering all maritime workers except masters or 'members of a crew of a vessel'. The Supreme Court has held that the effect of this act is to restrict the benefits of the Jones Act to 'members of a crew of a vessel'. Swanson v. Marra Bros., Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045. In discussing the effect of the Longshoremen's and Harbor Workers' Act, the First Circuit stated: 'The process of liberal construction of the Jones Act cannot now be ignored because Congress has seen fit to pass the Longshoremen's Act. As a result of the cases, we feel constrained to hold that one who does any sort of work aboard a ship in navigation is a 'seaman' within the meaning of the Jones Act.' Carumbo v. Cape Cod S.S. Co., 1 Cir., 1941, 123 F.2d 991, 995. In that case the court pointed out that even a cook or an engineer 'is aiding in navigation'.[6] Whatever may have been the original intention of Congress, courts have given an extremely liberal interpretation to the terms 'seaman' and 'member of a crew of any vessel' without provoking any congressional amendments restricting the coverage of the act.
 
 
 15
 Gianfala v. Texas Company, 1955, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775, reversing Texas Company v. Gianfala, 5 Cir., 1955, 222 F.2d 382, is the key case in the conversion of offshore oil field workers into seamen. Gianfala and other members of a drilling crew slept at a Texas Company oil field camp and did regular oil field work aboard a submersible drilling barge. The barge was resting on the bottom of a bay at the time of the accident. The drilling crew was handling casing pipe in the completion of operations of a well drilled to a depth of 11,000 feet. A lift lew out a piston rod that struck and killed Gianfala. The defendant contended that the drilling barge was not a vessel in navigation and that the decedent was an oil field employee whose duties were not primarily in aid of navigation. The trial court held that the decedent's status was a question for the jury. This Court reversed the district court in a unanimous opinion, holding that the facts were undisputed and that the applicability of the Jones Act is a question of law to be determined by the court. As a matter of law, the decedent was not aboard ship, primarily to aid in navigation; 'on the contrary he was aboard ship not as a member of the ship's crew, but as a member of the drilling crew' doing work done only by oil field workers. The Supreme Court, in a short per curiam opinion, granted a writ of certiorari, reversed this Court, and remanded the case to the district court with directions to reinstate its judgment.
 
 
 16
 The Supreme Court, without discussing the law, cited four cases in Gianfala: South Chicago Coal & Dock Co. v. Bassett, 1940, 609 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732; Summerlin v. Massman Construction Co., 4 Cir., 1952, 199 F.2d 715; Wilkes v. Mississippi River Sand & Gravel Co., 6 Cir., 1953, 202 F.2d 383, and Gahagan Construction Corp. v. Armao, 1 Cir., 1948, 165 F.2d 301, 305. These cases must be examined in order to understand the reasoning behind the per curiam opinion.
 
 
 17
 In South Chicago Coal & Dock Co. v. Bassett the decedent was employed aboard a lighter to facilitate the flow of coal from the lighter to vessels being fueled. He did not work while the lighter was enroute from the dock to the vessel and he had no duties to perform while the lighter was in motion. The Court held that there was sufficient evidence to support a finding of the commissioner that the Longshoremen's Act was the proper remedy and that the decedent was not a member of the crew under the Jones Act. Mr. Justice Hughes held that 'the word 'crew' does not have an absolutely unvarying legal significance' (309 U.S. 251, 60 S.Ct 548.) The determination, therefore, whether a person is a 'member of the crew', a word that has a 'wide range of variation', is a question of fact to be left to the trier of the facts. The Supreme Court observed, however, that as used in the statute, 'crew' seemed to mean 'employees on the vessel who are naturally and primarily on board to aid in her navigation.'
 
 
 18
 In Summerlin v. Massman Construction Co. the plaintiff was employed as a fireman on a floating derrick anchored in the York River. The derrick had no motive power of its own, no sleeping quarters, and was used in connection with pouring concrete into certain forms incident to building a bridge across the river. On an agreed statement of facts, the Fourth Circuit held that Summerlin was a Jones Act seaman and the derrick was a vessel engaged in navigation.[7]
 
 
 19
 In Wilkes v. Mississippi River Sand & Gravel Co. certain laborers were employed in dredging operations. Their duty was to level off gravel pumped up from the river bottom and dumped on the barges where they were working. This was their only duty, a duty somewhat less, one would think, than the duties of those 'naturally and primarily on board in aid of navigation'. The district court found that the claimants were simply common laborers employed to remove gravel. The Sixth Circuit reversed the lower court (202 F.2d 387), holding, on the authority of Bassett, that whether a claimant is a member of a crew is 'primarily a question of fact', since 'the word 'crew' does not have an absolutely unvarying legal significance'. The Court set up three requirements: '(1) that the vessel be in navigation; (2) that there be a more or less permanent connection with the vessel; and (3) that the worker be aboard primarily to aid in navigation'. The Court paused only over the third requirement. This it construed as not confined to those who 'hand, reef and steer' but applicable 'to all whose duties contribute to the operation and welfare of the vessel'. The decedents met the required standard. The Court was influenced by the fact that the decedents had a permanent connection with the barge and shared the same hazards as those shared by all aboard.[8]
 
 
 20
 In Gahagan Construction Corporation v. Armao the claimant was a deckhand on a dredge. The dredge pumped silt and sand from the bottom of the Boston harbor and by means of a pipeline extending from the dredge to the shore deposited it as fill on embankments for an airport. The district court refused to use the phrase 'member of a crew' in charging the jury. The trial judge stated, however, that in order to be a 'seaman' 'There must be a connection with a vessel, and that the person must play some part in connection with the labor about the operation and welfare of the vessel while in navigable waters.' In holding that such instructions were proper the First Circuit declared: 'Although perhaps it would have been preferable for the trial judge to use the term 'member of the crew' and then define it, there is no magic in that phrase that absolutely requires its use in a charge. (these) words are not such as to have any peculiar or particular significance to a jury.' (165 F.2d 306.) 'Crew includes all those who contribute to the labors about the operation and welfare of the ship', but 'each case presents a different situation' and 'no single factor is controlling'.
 
 
 21
 There are common denominators in Gianfala, Bassett, Summerlin, Wilkes, and Gahagan decisions. (1) The claimants are not ordinarily thought of as 'seamen' aboard 'primarily in aid of navigation', although they may serve the vessel in the sense that the work they perform fits in with the function the vessel serves. Gianfala was a member of a drilling crew on a submersible barge, Summerlin a fireman on a derrick, Wilkes a common laborer on a dredge, Gahagan a deckhand on a dredge. They had absolutely nothing to do with navigation, as such, nothing to do with the operations or welfare of a vessel in the sense that a vessel is a means of transport by water, and were not members of a ship's company in the sense that ship's cook or carpenter are necessary or appropriate members of a ship's complement. But in the light of the function or mission of the special structure to which they were attached, they served in a capacity that contributed to the accomplishment of its mission in the same way that a surgeon serves as a member of the crew of a floating hospital. The Bassett decision is the only one of the four cited in which there was judicial sanction of the requirement that the Jones Act seaman must be aboard 'primarily in aid of navigation', and in that case the question at issue was the sufficiency of the evidence to justify a holding under the Longshoremen's Act.[9] (2) The 'vessels' were not conventional vessels but special-purpose structures that in one case was on the bottom of the sea. In other words, under the Jones Act a vessel may mean something more than a means of transport on water.
 
 
 22
 Senko v. La Crosse Dredging Corp., 1957, 352 U.S. 370, 77 S.Ct 415, 1 L.Ed.2d 404, rehearing denied 353 U.S. 931, 77 S.Ct. 716, 1 L.Ed.2d 724 resolved some of the doubts the per curiam opinion in Gianfala raised. Senko was a handyman on a dredge. The dredge was anchored to shore and was used as a stationary earth-removing machine. He had applied to his union (Common Laborer's Union) for a job. The foreman of a construction gang assigned him to a job as 'deckhand' or 'laborer' on the dredge. Senko worked an eight hour shift, ran errands on shore, was paid by the hour, lived at home, drove back and forth each day, and brought his own meals to work. He had no duties connected with moving the dredge. Senko was injured ashore while placing a signal lantern from the dredge in a shack on land. He filed suit under the Jones Act in an Illinois state court. The jury returned a verdict in his favor, but it was set aside on appeal for lack of evidence to support a finding that he was a member of the crew. The Supreme Court reversed the holding and reiterated its position that such cases present a question of fact for the jury to decide. The majority opinion clarifies the Bassett holding:[10]
 
 
 23
 'As we have before, this Court does not normally sit to reexamine a finding of the type that was made below. We believe, however, that our decision in South Chicago Coal & Dock Co. v. Bassett, supra, has not been fully understood. Our holding there that the determination of whether an injured person was a 'member of a crew' is to be left to the finder of fact meant that juries have the same discretion they have in finding negligence or any other fact. The essence of this discretion is that a jury's decision is final if it has a reasonable basis, whether or not the appellate court agrees with the jury's estimate.
 
 
 24
 Because there was testimony introduced by petitioner tending to show that he was employed almost solely on the dredge, that his duty was primarily to maintain the dredge during its anchorage and for its future trips, and that he would have a significant navigational function when the dredge was put intransit, we hold there was sufficient evidence in the record to support the finding that petitioner was a member of the dredge's crew. cf. Giangala v. Texas Co., 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775, reversing 5 Cir., 222 F.2d 382. Accordingly, we reverse the decision below.'
 
 
 25
 In finding support for the jury finding, the majority took into consideration Senko's duty 'to maintain the dredge during its anchorage and for its future trips'. This, the majority felt, 'would have a significant navigational function when the dredge was put in transit'. Substantially all of the petitioner's duties were performed on or for the dredge and therefore 'a normal inference is that the petitioner was responsible for its seaworthiness'. We take the phrase 'significant navigational function' to mean something less than the phrase 'aboard naturally and primarily in aid of navigation'.
 
 
 26
 In Grimes v. Raymond Concrete Pile Co., 1958, 356 U.S. 252, 78 S.Ct. 687, 688, 2 L.Ed.2d 737 a contractor was building a 'Texas Tower', a radar station, 110 miles seaward of Cape Cod, permanently affixed to the floor of the ocean. The tower was constructed under a government contract subject to the Defense Bases Act (42 U.S.C.A. 1651-1654). This statute allows recovery for an injured employee under the Longshoremen's and Harbor Workers' Act, but expressly excepts members of a crew of a vessel; their remedy is under the Jones Act. Grimes was employed as a pile driver. For several weeks he assisted in the completion of the tower in to Bethlehem East Boston Yards. When the tower was towed to sea, he and twenty-five other workmen lived on it and kept it in condition. After the tower was anchored at its permanent site, Grimes performed only pile-driving. He was drowned when he fell out of a life ring used to carry him from a tug to the tower. The Supreme Court, reversing the First Circuit, 245 F.2d 437, held that the 'petitioner's evidence presented an evidentiary basis for a jury's finding whether or not the petitioner was a member of the crew of any vessel', citing Senko, Gianfala, and Bassett. Mr. Justice Harlan, dissenting, could 'find no room for debate that this individual is not a seaman, unless a 'seaman' is to mean nothing more than a person injured while working at sea'.
 
 
 27
 Shortly after deciding that a worker driving piles might be a seaman, the Supreme Court decided that an employee doing odd jobs around his employer's wharf might also be a seaman. Butler v. Whiteman, 1958, 356 U.S. 271, 78 S.Ct. 734, 735, 2 L.Ed.2d 754. Butler was last seen alive running across a barge to a tug, both owned by Butler's employer. The plaintiff's theory of the case was that the respondent was liable under the Jones Act because of his negligent failure to provide a gangplank for crossing between the two vessels. For some months before the accident the tug had been withdrawn from navigation as inoperable and for a year the tug had neither captain nor crew. Mr. Justice Harlan, with whom Mr. Justice Whitaker joined, dissented: '(it) taxes imagination to the breaking point to consider (butler) * * * a seaman.'
 
 
 28
 Appellants in the instant case-- correctly, we think[11] -- take the position that the traditional function of court and jury still obtains, in spite of the Gianfala to Grimes-- Butler series of cases, and that a court, trial or appellate, may in the proper case hold that there is no reasonable evidentiary basis to support a jury finding that an injured person is a seaman and member of a crew of a vessel under the Jones Act. They contend that this is such a case and rely on Texas Company v. Savoie, 5 Cir., 1957, 240 F.2d 674, 675, rehearing denied 5 Cir., 242 F.2d 667, 668 Certiorari denied 355 U.S. 840, 78 S.Ct. 49, 2 L.Ed.2d 51.
 
 
 29
 In the Savoie case the decedent, Guidry, was killed while working on a fixed platform in a navigable lake. Guidry, a roustabout, was carried from well-platform to well-platform aboard a lugger, the 'mary Virginia'. He was on one of these platforms when he was killed by an explosion. It was contended that he was a member of the crew of the lugger and that he was about the overall function for which that vessel was being operated in navigation when he met his death. The jury found that he was a member of the crew of the 'Mary Virginia'. This Court set aside the verdict of the jury.
 
 
 30
 'We agree with appellant that the Supreme Court in Texas Co. v. Gianfala, supra, did not intend to do away with the established federal procedure, * * *. From the undisputed facts in this case, the decedent was employed as a roustabout by appellant. He was employed to work on the platforms, not on the vessel. There is not substantial evidence to support the jury's finding that he was a member of the crew. He was an oilfield worker strictly, and not a boat crewman. His duties did not pertain to navigation, not even to the casual task of throwing a rope or making the boat fast, a service that readily could be performed by a harbor worker. He had no such duties to perform. He was merely a passenger on the Mary Virginia, and he was not on the boat when he met his death.'
 
 
 31
 On rehearing this Court found a 'factual distinction between (Senko and Savoie in) that in the (Savoie case) there was no evidence reasonably tending to show that the decedent was a member of the crew'; he was 'merely a passenger' and had no duties to perform in connection with its operation.
 
 
 32
 Reading Savoie as a gloss on the cases cited, particularly Senko, this Court's position may be stated, affirmatively: there is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.[12]
 
 
 33
 The Savoie case is not this case. There was no showing that Savoie performed any duties on the lugger; he was a passenger on a water-taxi. His duties related entirely to work on permanently fixed well platforms. Robison was attached, permanently, to Offshore No. 55. Offshore No. 55 is not a man-made island. Like the submersible barge in Gianfala, Offshore No. 55 was a special purpose vessel, a floating drilling platform. Robison's duties aboard that vessel contributed to here mission, to the operating function she was designed to perform as a sea-going drilling platform. Some of Robison's duties had a 'significant navigational function', like Senko's in that they related to the seaworthiness, maintenance (welfare) of Offshore No. 55. Some of his duties-- to which a jury might have attached importance-- though minor are traditionally the duties of seamen in that they related to the movement of the vessel as a means of transport on water.
 
 
 34
 Attempts to fix unvarying meanings have a firm legal significance to such terms as 'seaman', 'vessel', 'member of a crew' must come to grief on the facts. These terms have such a wide range of meaning,[13] under the Jones Act as interpreted in the courts, that, except in rare cases, only a jury or trier of facts can determine their application in the circumstances of a particular case. Even where the facts are largely undisputed, the question at issue is not solely a question of law when, because of conflicting inferences that may lead to different conclusions among reasonable men, a trial judge cannot state an unvarying rule of law that fits the facts.[14] The Jones Act cases involving coverage are similar in this respect to many negligence and contributory negligence cases.
 
 
 35
 Under the Jones Act, judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that the claimant was a seaman, a member of a crew of a vessel. In the recent case of Rogers v. Missouri Pacific R. Co., 1957, 352 U.S. 500, 507, 77 S.Ct. 443, 448, 1 L.Ed.2d 493, in an analogous situation, the Supreme Court stated that under the FELA 'the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought'. Even if the test were substantial supporting evidence, on the record as it comes to us, we would have to hold that there was a sufficient evidentiary basis for the trial court to submit the case to the jury.
 
 III.
 
 36
 Appellants complain of certain instructions of the trial court, especially on the ground that the instructions minimized the test that in order to recover the worker be 'aboard primarily to aid in navigation'. Our review of the cases shows this test has been watered down until the words have lost their natural meaning. On the Senko facts, 'significant navigational function' is not an equivalent test. (352 U.S. 370, 77 S.Ct. 418.) With due deference to the Supreme Court, we attach less importance to either of these catchphrases than we do to the cases piled on cases in which recovery is allowed when by no stretch of the imagination can it be said that the claimant had anything to do with navigation and is a member of the ship's company only in the sense that his duties have a connection with the mission or the function of the floatable structure where he was injured.
 
 
 37
 There is no reason for lamentations. Expansion of the terms 'seaman' and 'vessel' are consistent with the liberal construction of the Act that has characterized it from the beginning and is consistent with its purposes. Within broad limits of what is reasonnable, Congress has seen fit to allow juries to decide who are seamen under the Jones Act. There is nothing in the act to indicate that Congress intended the law to apply only to conventional members of a ship's company. The absence of any legislative restriction has enabled the law to develop naturally along with the development of unconventional vessels, such as the strange-looking specialized watercraft designed for oil operations offshore and in the shallow coastal waters of the Gulf of Mexico. Many of the Jones Act seamen on these vessels share the same marine risks to which all aboard are subject. And in many instances Jones Act seamen are exposed to more hazards than are blue-water sailors. They run the risk of top-heavy drilling barges collapsing. They run all the risks incident to oil drilling.
 
 
 38
 We find the trial judge's instructions fair, accurate, thorough, in step with the law.
 
 IV.
 
 39
 The admiralty doctrine of absolute liability for unseaworthiness is based on protection of seamen who sign articles for a voyage and are then under the absolute control of a master with power to order seamen to do the ship's work in any weather, under any conditions, using such equipment as may be furnished by the shipowner. Appellants aruge that the warranty of seaworthiness has no application here.[15]
 
 
 40
 Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 applied the doctrine of recovery for unseaworthiness to a longshoreman; Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, to a workman for an independent contractor who was adjusting 'feeders' used to load a vessel with grain; Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, to a stevedore injured because of the breaking of a snatch-block brought aboard ship by the stevedore's employer. Rogers v. United States Line, 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120 affirmed the broad application of the warranty of seaworthiness, as stated in Peterson. These and other cases stretch the warranty close to its breaking point in applying it to land-based harbor workers whose status as seamen is more dubious than Robison's. The only contrary authority cited by appellants is an able opinion by Judge Barnes for the Ninth Circuit, Berryhill v. Pacific Far East Lines, 1957, 238 F.2d 385. In that case Judge Barnes pointed out that in Sieracki and similar cases recovery was allowed because the stevedores do a seaman's work and incur a seaman's hazards; not so with Berryhill, who was injured when a grinding wheel furnished by his employer, a shipyard corporation, disintegrated while he was making repairs to machinery of a ship in dry-dock.
 
 
 41
 On the facts of this case, there was sufficient evidence for the case to go to the jury for the determination of whether Robison was a seaman, a member of the crew of a vessel, for purposes of the Jones Act and for purposes of recovering under the warranty of seaworthiness.
 
 V.
 
 42
 We have considered all of the other points relied on by the parties to this appeal. We find it unnecessary to discuss these points.
 
 The judgment is
 
 43
 Affirmed.
 
 Question Verdict
 
 44
 "(1) Was 'Offshore No. 55' a
 
 
 45
 vessel? Yes
 
 
 46
 "(2) If so, was Robison a
 
 
 47
 member of the Crew of that
 
 
 48
 vessel? Yes
 
 
 49
 "(3) If so, was the Defendant
 
 
 50
 negligent or the vessel
 
 
 51
 unseaworthy?
 
 
 52
 "(4) If so, was that negligence
 
 
 53
 or unseaworthiness a
 
 
 54
 proximate cause of Robison's
 
 
 55
 injury? Yes
 
 
 56
 "(5) If so, was Robison also
 
 
 57
 guilty of negligence which
 
 
 58
 contributed to his injury? Yes
 
 
 59
 "(6) If so, to what extent
 
 
 60
 did that negligence contribute
 
 
 61
 to his injuries? 25%
 
 
 62
 "(7) What is the total damages
 
 
 63
 suffered by Robison? $3,000.00."
 
 
 64
 CAMERON, Circuit Judge: I dissent.
 
 
 
 [1]
 The Jones Act is part of the Merchant Marine Act of June 5, 1920. 41 Stat. 1007, 46 U.S.C.A. 688
 
 
 [2]
 See the dissenting opinion of Mr. Justice Harlan in Grimes v. Raymond Concrete Pile Co., 356 U.S. 252, 255, 78 S.Ct. 687, 689, 2 L.Ed.2d 737: 'If the 'standing' requirements of the Jones Act are still to be regarded as having any real content, I can find no room for debate that (Grimes, a pile driver employed to work on a Texas Tower) is not a seaman, unless a 'seaman' is to mean nothing more than a person injured while working at sea.'
 
 
 [3]
 Defendants' motion for directed verdict rectied: 'The evidence shows that Offshore 55 was a platform designed and used solely for the purpose of drilling oil wells in offshore waters-- in this instance, the Gulf of Mexico. That the platform was not self-propelled and when moved from one well location to another, two large tugs were used. Further, when an oil well was being drilled the platform was secured to the bed of the Gulf in an immobilized position with the platform itself raised forty to fifty feet above the water level, depending on water conditions. P'That none of the personnel, including Robison, who worked on the platform were required to carry seaman's Merchant Marine papers and as far as the evidence shows, none did. That this plaintiff had never worked as a seaman-- he had never worked abroad a vessel of any kind, except while in the Navy, and when he applied for work he was employed as a roustabout, a job unheard of and unknown to the nomenclature of seamen. Robison was an oil field worker and not a boat crewman. His duties did not pertain to navigation but to those of drilling oil wells and maintaining the equipment for that purpose, all for which reasons the requirements for maintaining this Civil Action under the Jones Act have not been met.'
 
 
 [4]
 '(2) If so, was Robison a
 
 
 [5]
 There are several excellent and recent law review articles on the subject of maritime workers. See especially, Gisevius and Leppert, Modern Maritime Workers, 9 Loyola L.Rev. 1 (1958); Carrere, Recent Developments in Personal Injury Law in the Tidelands, 32 TulL.Rev. 274 (1958); Lyman, Barge and Dredge Workers as Seamen under the Jones Act, 32 Tul.L.Rev. 202 (1958); Eikel Legal Procedures in Maritime Personal Injury Litigation, 33 TulL.Rev. 323 (1959)
 
 
 [6]
 In the instant case implicit in the respondent's argument is the same distinction Mr. Justice Harlan makes in his dissenting opinion in Senko v. Lacrosse Dredging Corporation, 1957, 352 U.S. 370, 377, 77 S.ct. 415, 419, 1 L.Ed.2d 404: 'I do not, of course, contend that men such as ship's cooks cannot be members of a crew merely because their actual jobs have nothing to do with making the vessel move. The vital distinction is that such men do contribute to the functioning of the vessel as a vessel-- as a means of transport on water. Not so Senko, whose duties had absolutely nothing to do with the dredge in its aspects as a vessel.'
 
 
 [7]
 The Court considered the case similar to Jeffrey v. Henderson Bros., 4 Cir., 193 F.2d 589. There certain employees on a coal cleaning barge were held to be seamen. The barge had no motive power and was furnished with machinery and equipment for cleaning and screening coal
 
 
 [8]
 'In our judgment, an employer who hires men to work on the water on vessels engaged in navigation and permits them to have such a permanent connection with the vessel as to expose them to the same hazards of marine service as those shared by all aboard should not be permitted, by merely restricting their duties or by adopting particular nomenclature as desciptive of their tasks, to limit his liability to such employees, in the event of disability or death alleged to have been caused by the negligence of the employer, to the extent prescribed by the Longshoremen's Act.' Wilkes v. Mississippi River Sand & Gravel Co., 6 Cir., 1953, 202 F.2d 383, 388
 
 
 [9]
 'That is our concern here in construing this particular statute-- the Longshoremen's and Harbor Workers' Compensation Act-- with appropriate regard to its distinctive aim. We find little aid in considering the use of the term 'crew' in other statutes having other purposes. This Act, as we have seen, was to provide compensation for a class of employees at work on a vessel in navigable waters who, although they might be classed as seamen 'International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157, supra), were still regarded as distinct from members of a 'crew'. They were persons serving on vessels, to be sure, but their service was that of laborers, of the sort performed by longshoremen and harbor workers and thus distinguished from those employees on the vessel who are naturally and primarily on board to aid in her navigation.' South Chicago Coal & Dock Co. v. Bassett, 1940, 309 U.S. 251, 261, 60 S.Ct. 544, 549, 84 L.Ed. 732
 
 
 [10]
 Mr. Justice Harlan, however, points out: '(Bassett) does not suggest that a jury's verdict on this issue is to be accorded some special sanctity. That case simply held that a District Court could not grant a trial de novo on an issue within the primary jurisdiction of the Administrator, under the Longshoremen's Act. * * * This Court did in fact examine the Administrator's determination that the plaintiff there was not a member of a crew, and sustained it only after concluding that it was supported by the evidence. Further, the Court's citation of Bassett in Cantey v. McLain Line, Inc., 312 U.S. 667, 61 S.Ct. 829, 85 L.Ed. 1111, supra, would seem in context to imply that the Court regarded the result in Bassett as reflecting its own independent determination as to the status of the petitioner there, rather than as a decision passing merely on the scope of judicial review to be accorded to the determination of the Administrator. And, if that be so, Bassett should surely control the result here, since if the Bassett petitioner was as a matter of law not a 'member of a crew,' a fortiori, Senko was not.' Senko v. La Crosse Dredging Corporation, 1957, 352 U.S. 370, 77 S.Ct. 415, 420, 1 L.Ed.2d 404
 
 
 [11]
 'While this court is bound by the findings of fact of the District Judge, if they are supported by substantial evidence and are not clearly erroneous, it would seem that the principles of the Bassett case permit us to attach a different legal interpretation to the wore 'crew' from that applied by the District Judge. We think this view is supported by Warner Co. v. Norton, 3 Cir., 137 F.2d 57, affirmed by the Supreme Court, 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931. At pages 58 and 59 of 137 F.2d of the opinion, the Court of Appeals said: 'While the question as to whether a particular claimant is 'a master or member of a crew' of a vessel and therefore excluded from the Compensation Act is one of fact, it is necessarily an ultimate conclusion to be derived from an application of the statute to the basic findings of fact. As such, it is open to court review for a determination of its validity on the basis of the supportable facts as found by the Commissioner. In short, a Commissioner's conclusion that one is or is not 'a master or member of a crew' is not binding upon a reviewing court if the basic facts competently found by the Commissioner rightly call for a different conclusion.' In Schantz v. American Dredging Co., 3 Cir., 138 F.2d 534, 536, after quoting from Warner Co. v. Norton, Supra, Judge Goodrich said: 'The same rule will apply to findings of judge or jury when the plaintiff's effort is to escape the Longshoremen's Act, rather than to get under it, and the litigation is a law suit instead of an application for compensation.' Wilkes v. Mississippi River Sand & Gravel Co., 6 Cir., 1953, 202 F.2d 383, 387
 
 
 [12]
 In Osland v. Star Fish & Oyster Co., 5 Cir., 1939, 107 F.2d 113, 114 this Court held that a fisherman who worked on shores was a seaman under the Jones Act. The Court said: 'The term includes all those on board whose labor contributes to the accomplishment of the main object in which the vessel is engaged.' In Daffin v. Pape, 5 Cir., 170 F.2d 622, 625, a porter and handyman was held to be a member of the crew on the ground that 'his labors contributed to the accomplishment of the main objectives toward which the vessel was engaged.'
 
 
 [13]
 See the very able opinions of Judge Clark for the majority and Judge Lumbard for the minority in Weiss v. Central Railroad Co. of New Jersey, 2 Cir., 1956, 235 F.2d 309, analyzing the cases definding, and refining, the term 'seamen'. All of the authorites up to 1956 are collected and discussed
 
 
 [14]
 'As the Supreme Court has stated, the world crew does not have an absolutely unvarying legal significance. Even if the facts are undisputed, the question of whether a party is a member of the crew is not necessarily one of law. If different conclusions may be drawn from the facts, the determination of the finder of facts must stand.' Gahagan Const. Corp. v. Armao, 1 Cir., 1948, 165 F.2d 301, 305
 
 
 [15]
 Compare the argument in Weiss v. Central Railroad Co. of New Jersey, 2 Cir., 1956, 235 F.2d 309 that maintenance and cure was never intended as a remedy for land-based 'Jones Act seamen'; the remedy was designed only for those who lead the life traditionally peculiar to seamen