T. W. CREEL

v.

The DRILL TENDER JACK CLEVERLY, her Engines, Motors, Appurtenances, etc., the Rowan Drilling Company, Inc., the Continental Oil Company, and Travelers Insurance Company.

No. 9924.

United States District Court
W. D. Louisiana,
Lafayette Division.

Sept. 6, 1966.

Nichols & Drewett, E. M. Nichols, Lake Charles, La., for plaintiff.

Davidson, Meaux, Onebane & Donohoe, Timothy McNamara, Lafayette, La., for defendants.

PUTNAM, District Judge.

This is a suit under the Jones Act. Libelant, T. W. Creel, was employed by Rowan Drilling Company, Inc., from June 28, 1960 to the date of the accident resulting in his alleged injuries, December 27, 1960, in connection with operations being undertaken by Rowan in search of oil, gas or other minerals in the Gulf of Mexico, under contract to Continental Oil Company.

The first issue to be decided is the question of libelant's status as a seaman or member of the crew of a vessel, so as to bring him within the coverage of the Jones Act, 46 U.S.C.A. § 688.

The evidence established that in this operation Rowan operated a drilling tender, the "Jack Cleverly", under bareboat charter, which tender was assigned to servicing Rig No. 11 at the time of the accident and for several months prior thereto. The rig itself was not located aboard the tender, but was assembled on a stationary drilling platform permanently affixed to the ocean floor. It was moved by tow from one location to another on another vessel called a rig barge, from which it was removed for assembly on the platform.

The "Jack Cleverly" was outfitted with mud pumps, mud tanks, air lines, water lines and Halliburton lines for cementing operations when required, all of which were connected to the rig being operated on the platform. In addition, supplies of mud and chemicals, drill pipe, casing and other items used in the drilling operation were kept aboard the vessel for use when needed, and it was fitted with a crane for loading and unloading these supplies and other cargo from supply boats that came alongside periodically.

There were a licensed captain, four deck hands, a diesel operator, an electrician and a catering crew aboard the Jack Cleverly in addition to what is referred to as the drilling crew. Libelant was a member of the drilling crew, paid an hourly wage and was working twelve hours a day. The drilling crews ate and slept aboard the Jack Cleverly, they loaded and unloaded cargo and supplies for the drilling operation when they came aboard from supply boats, and, when drilling operations were not being conducted by reason of adverse weather conditions or when the rig was being moved, they remained aboard the vessel for their customary hitches of ten days. At such times they cleaned the mud pits, serviced the pumps, chipped and painted the mud room and generally did mainte-

nance work in those portions of the vessel and on its equipment used in the operation of Rig No. 11. Also, when the ship moved from one location to another they handled lines and assisted in mooring, setting anchor buoys, and attaching and setting up the service lines from the ship to the rig on the platform. On these occasions a full 12-hour shift was put in doing this type of work.

It was stipulated that floor hands, as distinguished from the mud men and pump operators (who were also considered to be members of the drilling crew), performed 90% of their work on the fixed platform and drilling rig, and 10% of their work on the tender. It was further stipulated that the 10% working time aboard the tender could be broken down into 6% spent in loading and unloading cargo on a daily basis, and 4% spent in chipping, painting, scraping and handling lines and otherwise working upon the vessel and its equipment when the rig was shut down during bad weather or when the vessel was being moved.

Creel testified that when he was employed by Rowan a representative of the company called him and said that he could go to work as a tender hand. The parties stipulated that he worked as mud man on the tender for four and one-half months after his employment, then was assigned to the derrick floor by his superior. His duties as a mud man were performed almost exclusively on the tender and were required to enable the vessel to supply drilling mud to the rig on the platform.

The Jack Cleverly is a vessel designed and equipped to perform several special functions in aid of the drilling operation on the stationary platform, among which are: (1) to provide living accommodations, meal service and recreational activities for the drilling crew and others engaged in operating the rig on the platform; (2) to serve as a cargo barge or floating supply base for drilling mud, chemicals, drill pipe, casing and other supplies needed in the course of the operation of the rig; and (3) to provide heavy duty mud pumps and to supply

drilling fluid to the rig while drilling is in progress, to provide air compressions and compressed air to the rig, and to supply fluid cement to the platform when and as required in the drilling operation. The mud pumps, mud pits, air compressors, connecting lines, crane and other machinery located aboard for these purposes form part of the gear, tackle and equipment of the vessel itself.

[1] Whether or not one is a seaman or member of the crew is a question of fact defending upon the circumstances of each particular case. All facets of the claimant's employment and duties must be considered. To rehash the jurisprudence summed up in Offshore Co. v. Robison, 5 Cir. 1959, 266 F.2d 769, 75 A.L.R.2d 1296, would be superfluous. Later decisions in this circuit have steadfastly adhered to the principles recognized in that opinion. See Braniff v. Jackson Ave.-Gretna Ferry, Inc., 5 Cir. 1960, 280 F.2d 523; Stanley v. Guy Scroggins Construction Co., 5 Cir. 1961, 297 F.2d 374; Tipton v. Socony Mobil Oil Co., 315 F.2d 660, 5 Cir. 1963, rev'd on other grounds, 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4, (which involved a tender-platform operation similar to the one at bar); Rotolo v. Halliburton Co., 5 Cir. 1963, 317 F.2d 9; Noble Drilling Corporation v. Saunier, 5 Cir. 1964, 335 F.2d 62; Producers Drilling Co. v. Gray, 5 Cir. 1966, 361 F.2d 432.

In Robison, supra, the court said:

" * * * there is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was *assigned permanently to a vessel* * * * or performed a *substantial part* of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or *to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.*" (266

F.2d at page 779. Emphasis supplied.)

The facts now before us present an unusually close question on this point. In *Tipton,* supra, under a similar situation involving a drilling tender-fixed platform operation, a jury resolved the issue against the employee. In Ross v. Delta Drilling Company, E.D.La.1962, 213 F.Supp. 270, the court, after the jury failed to agree, resolved the issue against the claimant. In Mire v. Loffland Bros. Co., et al., No. 7245, Western District of Louisiana, another case involving a floorhand employed aboard the Jack Cleverly, a jury verdict was rendered in favor of the claimant. No appeal was taken in this case.

In the present state of the law, there is little room for doubt but that the Jack Cleverly is a vessel of the type described in the authorities cited above as one having a special purpose, and that all persons employed aboard to render services or perform work required to enable the vessel to perform her specialized functions and accomplish her mission, are seamen or members of the crew of the tender, entitled to the remedy afforded by the Jones Act, 46 U.S.C.A. § 688. Offshore v. Robison, supra.

When Creel was employed and for four and a half months thereafter, his duties were almost entirely aboard the Jack Cleverly. His attachment to the ship was permanent, and the work in which he was originally engaged was directly and primarily for the benefit of the ship and in furtherance of her special purpose, i. e., to supply fluid drilling mud to the drilling rig on the platform. As such he was clearly a member of the crew of the ship. His employer was the operator and owner pro hac vice of the tender, in complete control of the vessel and her crew. He was assigned to work on the platform by his superior some six weeks before the accident in question, but continued to perform a substantial portion of his duties aboard the tender in aid of the purposes of the vessel and the accomplishment of her mission.

Furthermore, it may reasonably be inferred from the stipulated facts that the drill collar he was working with at the time of the accident, which we discuss in detail below, was a part of the cargo of the Jack Cleverly destined for use in the drilling operation of his employer, and that it was in the process of being transferred to the rig at the time libelant was injured. We point out, however, that this consideration does not control our decision in this case.

■ The fact that a seaman is injured ashore and not aboard ship does not defeat his right to the remedy provided by the Jones Act. O'Donnell v. Great Lakes Dredge & Dock Co., 1943, 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596; Senko v. LaCrosse Dredging Corp., 1956, 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404; Braen v. Pfeifer Oil Transportation Company, 1959, 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191; so long as he is in the course and scope of his employment. In *Braen* the following language is used:

"Petitioner was acting 'in the course of his employment' at the time of the injury, for at that moment he was doing the work of his employer pursuant to his employer's orders. No more is required by the Jones Act, as the O'Donnell case indicates, petitioner being a seaman who was injured as a consequence of the negligence of his employer." (361 U.S. 129, at 133, 80 S.Ct. 247, at 250, 4 L.Ed.2d 191, at 195)

■■ On the issue of status, therefore, we hold in favor of the libelant, T. W. Creel. This holding must be restricted to the facts of this particular case. It is clear, in our opinion, that those offshore workers whose primary employment is on a fixed platform or other structure permanently affixed to the ocean floor are not attached to or in the service of a vessel, even though they may be called upon from time to time to go aboard vessels for transportation to and from work, as in Texas Co. v. Savoie, 5 Cir. 1957, 242 F.2d 667, cert. den. 355 U.S. 840, 78 S.Ct. 49, 2 L.Ed.

2d 51, or for that matter, to sleep and eat while not working as is the case frequently seen in this area by use of the so-called quarterboat, or to obtain supplies for the drilling operation. In those instances a contrary finding might easily result, where the injured workman is found to be a recipient of the services of the vessel, rather than one who performs a substantial portion of his work in furtherance of the mission of the ship. Compare: Sirmons v. Baxter Drilling Inc., W.D.La.1965, 239 F.Supp. 348; Dixon v. Oosting, E.D.Va.1965, 238 F.Supp. 25; Hill v. Diamond, E.D. Va.1962, 203 F.Supp. 877, aff'd 4 Cir., 311 F.2d 789, Ross v. Delta Drilling Co., supra.

We turn now to the facts of the accident and the issues of negligence, causation and contributory negligence. At the time, Creel was on the rig floor located on the fixed platform, where he and several co-workers were picking up drill collars from the platform deck by means of an air hoist. He was standing in the V-door of the derrick, a fellow employee was operating the air hoist which was located behind him, and it was his assignment to pull the hoist cable down after a collar had been lifted into the derrick to allow slack so that it would reach the platform deck, some fifteen feet below, and could be tied on to the next collar to be lifted. He was at the edge of the rig floor, which caused him to lean over somewhat to watch the tying operation. Another employee on the platform deck had just received the cable, taken two or three turns around the collar and secured it with a hook attached to the cable's end. This man then gave the signal to take it up.

At this point the evidence is not clear as to exactly what happened. There was some slack in the cable, as this was necessary to tie it on to the collar. Libelant was last seen by the workman on the platform, Van Allen, just before he bent over to tie on the collar and gave the word to take it up. This witness testified that Creel had one hand on the cable at the time, and that he probably

was still pulling slack. The hoist operator, Sanchez, did not see libelant until after he had heard the order to tighten up and had applied power to the hoist, when he saw him flying through the air, out of the V-door. He was above or slightly below the derrick floor. Van Allen did not see him until he landed on the platform catwalk in front of him. Two other employees who were on the derrick floor with Creel assisting in the operation were engaged in calibrating the last drill collar lifted, and saw nothing more than what is outlined above. In the pretrial stipulation filed, libelant sets out his position in paragraph 3 to be that slack in the line accumulated behind him, and when it was tightened it struck him, causing the fall. We believe that this is the only logical inference to be drawn from the evidence, considering the force with which libelant was propelled from the derrick floor.

■ Two things emerge from the testimony. Sanchez, who operated the hoist, tightened the slack in the line rapidly immediately upon hearing or seeing the signal to pick up. He did this without looking to see if the line was clear or that it could be done with safety to the others he knew to be working with him. Creel, on the other hand, did not keep a proper lookout for his own safety. He allowed the line to get behind him, or placed himself in a position between the line and the V-door, where he was in imminent danger from the cable if it became taut. In our opinion, both were guilty of negligence in this instance, which combined and concurred to directly and proximately cause this unfortunate accident.

Both men had been instructed in the use of the air hoist and cables while lifting heavy objects. Creel was fully aware of the fact that he should stand clear of the line immediately after giving slack to the men below him. His position was most precarious, with nothing between him and a fifteen-foot fall to a metal deck. The danger of being jerked or thrown from the derrick was obvious. He also knew that as soon as the signal to lift was given, the operator would automatically hit the air control and take the slack out of this line. We find that under the rule of comparative negligence applicable here, his negligence contributed at least 50% to the occurrence of the accident.

Creel fell across one of the drill collars, where he hung momentarily, then to the catwalk, striking his head on the platform floor. He suffered severe and painful injuries to his head and neck, among which was a basal skull fracture. These injuries have resulted in some residual disability.

We will not discuss the medical evidence in detail. Libelant was taken ashore to a hospital in Morgan City, Louisiana, immediately after the accident on December 27, 1960. He remained there in a comatose condition, rousing infrequently, until January 4, 1961, when he was removed to a hospital in Hattiesburg, Mississippi. He was discharged from the hospital on January 8, 1961, and his attending physician, Dr. Runnels, stated that he was then alert, with no disorientation, but with a slight facial paralysis of the central type. About January 24, 1961, Creel was found to be suffering from a hearing loss which this doctor attributed to eighth nerve damage. He was referred to Dr. Herring, an ear specialist, on January 26, 1961, who confirmed the hearing loss, but who is not positive in his testimony that it resulted from the accident.

In December of 1964, libelant suffered a seizure of some kind while driving with his wife. Dr. Runnels saw him at the hospital immediately following this incident. He referred him to Dr. Colclough, who diagnosed the case as epilepsy caused by the head injury. Other neurologists and neuro surgeons have examined Creel, and all agree that if the seizure was epilepsy, it was not caused by the accident. The diagnosis of Dr. Colclough is not supported by electro-encephalograms and X-ray studies or any other neurological symptoms.

■ Without going further into the medical evidence, we find that the evidence preponderates against his claim that he now suffers from epilepsy due to this accident. We conclude that if this condition is present, it is due to some other cause not connected with the injury of December 27, 1960.

We do find that he has suffered a partial loss of 35% of the hearing in his left ear, there is a very slight facial paralysis remaining, and slight weakness of the right arm. He suffers from frequent headaches, nervousness, and a generally anxious state of mind which Dr. Naef, a neurologist-psychiatrist, classified on May 15, 1961, as a post concussion syndrome with anxiety neurosis. There is no permanent brain damage. Dr. Naef also found a hearing loss in the left ear, attributed by him to the accident.

■ It was libelant's testimony that he had tried to return to oil field work but was unable to do this because of nausea, dizziness and headaches. He was supported in this testimony by that of one of his fellow workmen, who observed him and stated he did not act like the same man and appeared to be confused.

There is no hard and fast rule that can be used to determine quantum. Libelant was twenty-four years old at the time he was hurt, and earned about $6600.00 per year. He suffered and still suffers off and on from the effects of his injury, but what remains today is chiefly the result of an anxiety neurosis. His life expectancy is approximately 42 years, using current tables as a guide. We do not consider him to be totally disabled by any means. There are any number of occupations this young man can follow profitably in mitigation of his present inability to return to heavy and dangerous work in the oil fields.

We feel that an award of $75,000.00 is fully adequate to compensate libelant for all elements of damage claimed by him, including past and future pain and suffering, loss of wages and impairment of future earning power, and any future medical expenses he may reasonably be expected to incur. Maintenance was paid him to the point of maximum recovery, and past medical expenses to this point have been paid by respondents. The claim for maintenance and cure is, therefore, fully satisfied.

Since we have found libelant contributorily negligent to the extent of 50%, this award is reduced to $37,500.00. Judgment will be prepared and submitted for signature pursuant to Rule 9(e), Western District of Louisiana, by the proctor for libelant.