**Clyde E. CALLENDAR**

v.

**EMPLOYERS LIABILITY ASSURANCE CORP., Ltd. and Reading and Bates Offshore Drilling Co.**

**Civ. A. No. 15652.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Nov. 29, 1967.

---

R. C. Edwins, Baton Rouge, La., for plaintiff.

J. Y. Gilmore, Jr., New Orleans, La., for defendants.

## MEMORANDUM OF DECISION

COMISKEY, District Judge.

Clyde E. Callendar seeks damages for negligence under the Jones Act, unseaworthiness, and maintenance and cure against his employer, Reading and Bates Offshore Drilling Co.

On May 21, 1964, the plaintiff was working as a derrick man on the defendant's vessel, C. P. BAKER, doing offshore drilling in the Gulf of Mexico. As derrickman, plaintiff was at a station on the vessel about eighty-five feet in the air from the drilling floor. There Callendar walked and worked on a monkey board strapped with a safety rope around his waist. The seas were rough. Swells, eight to nine feet in height, caused the top of the derrick 95 feet in the air to sway about 15° in opposite directions. At noon Callendar went up to his station and spent about two and a half hours latching and unlatching the elevators to and from drill pipe and collar and moving the pipe into racks between fingers on the side of the monkey board. About 2:30 that afternoon, Callendar and members of the drilling crew worked on the floor testing blow-out preventers until about 4:00 o'clock when he was ordered back to his station in the derrick. Working in the derrick earlier that day he noticed the latches on the elevators were becoming difficult to engage and as he was returning to the derrick he told the driller that the latches were starting to need some dope or grease. This was customarily applied on the derrick floor level. Apparently no one took any measures to apply grease or dope on the elevators. Now the plaintiff was on the monkey board eighty-five feet high in the derrick and maneuvered the first ninety foot stand of drill collar from its resting position between the fingers on the side of the monkey board. This was a difficult maneuver, complicated by the swaying derrick caused by the excessive ground swells. Then the plaintiff attempted to latch the elevator to the pipe, but the presence of mud and dirt on the elevator

latch prevented it from locking. Changing his position, he tried to get more leverage by placing one leg around the drill collar string. In this awkard stance with only one foot on the floor, he tried again to slam the mud and dirt choked elevator latch closed. At this moment the derrick shifted with the wind and the waves, plaintiff's body twisted and was thrown to the side. He suddenly experienced an intense pain in his back which later was diagnosed as ruptured discs at the levels of L–4, L–5 and L–5, and S–1.

Callendar contributed to the principal object of the vessel's purpose and he was, in fact, a seaman. Offshore Co. v. Robinson, 266 F.2d 769, 75 A.L.R.2d 1296 (5th Cir.) (1959); Marine Drilling Co. v. Autin, 363 F.2d 579 (5th Cir.) (1966). The plaintiff is owed the warranty of seaworthiness by the vessel owner since he was a seaman employee. Ledet v. U. S. Oil of Louisiana, Inc., 237 F.Supp. 183 (1953) (D.C.La.)

The fact that the elevator hinges were stiff and largely unworkable due to their muddy condition and the failure to make them reasonably fit to properly function by the application of grease or dope as is the custom, resulted in the presence of an unseaworthy condition aboard this vessel. Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); McDonald v. United States, 321 F.2d 437 (3rd Cir.) (cert. denied 375 U.S. 969, 84 S.Ct. 487, 11 Ed. 2d 417) (1963).

Under the circumstances, we find that the direct and proximate cause of the accident from which the plaintiff suffered his injuries was the concurrent unseaworthiness of the vessel's elevator hinges and the negligence of the vessel owner in requiring plaintiff to work at his station 85 feet in the air in a derrick swaying approximately 15° in opposite directions due to the rough seas. It may be that rough seas are frequently encountered by seamen, but when rough seas are encountered by derrick vessels with a ninety-five foot tower at the top of which the plaintiff and other derrick men must work, the Court feels that the vessel owner is under an obligation to employ some safety measures to eliminate the increased danger, and if everything else fails, then possibly to halt work until calmer waters will reasonably permit safe access into high towers above the seas by derrick men like the plaintiff. When the driller in charge was questioned about the prudence of continuing work high in the derrick in view of the rough seas and swaying derrick, his response was one that showed a lack of reasonable care for the plaintiff's safety. The driller reportedly stated: "If its too rough for everybody else, it's just right for me". Of course the driller worked on the rig floor, not up in the derrick with the plaintiff. The defendant failed to exercise reasonable care under the circumstances, which failure was negligence and contributed to the plaintiff's accident. Compare Trahan v. Superior Oil Co., 322 F.2d 234, 5th Cir. (1963); McBrien v. United States Petroleum Carrier's, Inc., 177 F.Supp. 627 (1959) (S.D. N.Y.).

The defendant urges contributory negligence as a complete or partial bar to plaintiff's recovery. The defense is without merit. The plaintiff had little freedom to decide whether or not to take his station on the monkey board. Such were his orders from those in charge of the vessel. Certainly, therefore, the negligence in requiring the plaintiff to work in his highly dangerous station in view of the rough seas was not a matter to which the plaintiff could have reasonably contributed by his obedient response in any way. The defendant urges that the plaintiff should have greased or doped the elevators, but the evidence is strong that these materials were really available only on the derrick floor where greasing and doping is usually done, and it is handled almost exclusively by those in charge and working with the driller on the derrick floor. The greasing and doping of mud stuck elevators is a task which

lends itself to action on the derrick floor, and not on the monkey board eighty-five feet in the air.

The plaintiff went to work after finishing the sixth grade, and, except for time in the service of his country, has spent practically all of his life as an oil field worker, mainly on water. He had recently signed up for oil field work in the Middle East, and was waiting his assignment when this accident happened. The plaintiff was 42 years of age when this injury occurred and is now 45.

After his injury, a history of medical care, hospitalization, pain, suffering, disability and surgery fill the record. His total out-patient treatment runs 209 days and his total in-patient treatment in hospitals totals 42 days. On January 29, 1965 his attending physician discharged him with advice that he would progress no further medically. Since the accident his job pattern has been that of a substantially disabled man. He tried working for a vending company, he tried working with a laundry, he tried working with an express company, but these jobs required driving a truck and his disability made his performance of the job impossible. He tried working as a combination caretaker and bartender for a V.F.W. Hall, but even this work was too much, and the income was awfully little. Finally, he has found what appears to be a reasonably permanent job with a creosote factory. His duties include that of a watchman on the premises and the watching of dials that reflect pressures or temperatures. The principal activity is the watching and turning of dials to raise and lower temperatures or pressures. His actual pay is $86.00 per week. His attitude toward the work is one of unhappiness after many vigorous good paying years of oil field work in the open air. The medical testimony shows definite permanent disability. The only dispute is what percentage of disability and that ranges from 33⅓% down to 15%, but all concur that this plaintiff cannot return to the type of work he was doing when he was injured. His income records for 1962, 1963, 1964, 1965 and 1966 are in evidence and a fair analysis shows that but for the accident the plaintiff's average monthly income would certainly be at least $500.00 per month. After the accident his loss of income from June 1964 to December 1964 was $3,500.00, during 1965 it would have been $6,000 less $1,000 earned from odd jobs. For 1966 his income would have been $6,000 less the $3,721 earned from odd jobs and the creosote works, or a loss of $2,279.00. For 1967 a fair estimate of his loss of income would be $3,500 making a loss of earnings through calendar 1967 the sum of $14,279. The amount of $25,000 for pain, suffering, mental anguish and future loss of earning capacity seems reasonable under the circumstances.

Plaintiff also has incurred drug bills totaling $455.25 for medicines to try to relieve pain. The cost of future surgery, a spinal fusion, was reliably set at $1,500.00 during the trial. Past medical expenses owed by plaintiff to his treating physician in his home town amount to $541.30 and is likewise an element of damages and should be included in the judgment. This medical bill shows 65 visits by the plaintiff to his physician from May of 1964 to March of 1966.

As a seaman, Callendar is entitled to maintenance and cure from the date of his injury until January 29, 1965, the day on which he reached maximum medical recovery, but the record shows the maintenance and cure has already been paid.

The total amount of the judgment, therefore, is the sum of $41,775.55. The clerk will prepare a judgment.