Claiborne McCARTY
v.
SERVICE CONTRACTING, INC.
Civ. A. No. 69-228.

United States District Court,
E. D. Louisiana,
Baton Rouge Division.
Sept. 25, 1970.

R. C. Edwins, Edwins, Cave & McKay, Baton Rouge, La., for plaintiff.

Tom F. Phillips, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for defendant.

WEST, Chief Judge:

Plaintiff, Claiborne McCarty, brings this action seeking damages for injuries which he sustained on January 9, 1969 while working as a derrick hand on board a submersible drilling barge, the SCI Rig No. 1, which was owned and operated by his employer, Service Contracting, Inc., defendant herein. Federal subject matter jurisdiction in this case rests on the Jones Act, Title 46, U.S.C.A., § 688, and General Maritime Law. The threshold questions, therefore, are first, whether or not plaintiff was employed by defendant as a "seaman," and secondly, whether or not he was employed as such on board a "vessel." Gilmore & Black, The Law of Admiralty, § 6–21, p. 282 (1957). The jurisdictional facts being undisputed, the answer to both questions must be in the affirmative.

An invaluable aid in offshore oil exploration, a submersible drilling barge is a unique craft whose specialized purpose is the location and commercial production of oil reserves found beneath the surface of the water. By the very nature of their job these specialized craft must be capable of at least some degree of mobility on navigable waters and there is now simply no question but that such craft are "vessels" within the import of both the Jones Act and General Maritime Law. Gianfala v. Texas Company, 350 U.S. 879, 76 S.Ct. 141, 100 L. Ed. 775 (1955); Marine Drilling Co. v. Autin, 363 F.2d 579 (CA5—1966); Producers Drilling Co. v. Gray, 361 F.2d 432 (CA5—1966); Offshore Co. v. Robison, 266 F.2d 769 (CA5—1959). Since plaintiff, as a derrick hand and member of the drilling crew, was obviously contributing to the oil exploration function of the SCI Rig No. 1, he is, under such circumstances, entitled to be included within the traditional classification of "blue water" seamen, albeit vicariously. See, e. g., Offshore Co. v. Robison, supra; Callendar v. Employers Liability Assurance Corp., 283 F.Supp. 213 (E.D. La.1967); Comment, When Is An Offshore Oilfield Worker A Seaman?, 27 La. L.Rev. 757 (1967). Therefore, if as he alleges, plaintiff was in fact injured due to the *negligent operation*, or *unseaworthy condition*, or both, of the SCI Rig No. 1, he too, as a "blue water" seaman, is entitled to the relief afforded him by the Jones Act and General Maritime Law.

A non-jury trial in this case was had before this Court on July 15, 1970 at which time the following facts were elicited: On January 9, 1969, the SCI Rig No. 1 stood some thirty miles off the

Louisiana coast at a prospective drilling site in the Gulf of Mexico. At the time plaintiff was injured, the drilling crew was engaged in the process of "tripping" (or inserting) into the well hole a string of 2⅞ inch drill stem. When going into the hole with drill stem, plaintiff's job as a derrick hand required that he position himself along side a horizontal storage rack located immediately adjacent to and a little below the derrick floor. As the driller used a device called a "block" to lower each ninety foot section of drill stem into the well, plaintiff was required to fasten a length of soft line to the end of the next section of drill stem lying on the storage rack. The other end of the soft line was attached to the block which when raised by the driller would in turn lift the section of drill stem to a vertical position preparatory to assembly and placement in the well. The soft line with which plaintiff ordinarily worked was a stout piece of rope of at least 1½ inch diameter which, according to the evidence, was more than adequate in size for the job it was being used to do. Plaintiff had just finished fastening the soft line to a section of drill stem and was guiding it upward by hand as the driller began raising the block when, for reasons unknown, the soft line parted some one or two feet above its lower end. The section of drill stem fell, striking plaintiff in the head, the force of the blow knocking him to the derrick floor. He was immediately assisted to the crew's quarters, given first aid treatment, and later removed by crew boat to a hospital ashore.

Defendant admits the occurrence of the incident described above but denies that the drill stem fell or that plaintiff was injured because of the negligent operation or unseaworthy condition of the SCI Rig No. 1. In addition, defendant contends that plaintiff's injuries were in fact caused by his own "fault, neglect, and inattention to duty," and that such contributory negligence on the part of plaintiff should operate either as a complete bar to his recovery or otherwise proportionately decrease any damages to which he might be entitled. The defense is without merit. The evidence before this Court shows that plaintiff can in no way be held to have caused or contributed to the occurrence of the unfortunate incident which resulted in his injury. There was simply no evidence whatsoever adduced at the trial of this case which tended to show that plaintiff had negligently or improperly affixed the soft line to the section of drill stem which subsequently fell and hit him. Nor was there any evidence showing that plaintiff should not have been standing immediately below the section of drill stem as it was being lifted. It was in fact necessary for him to be in that location in order to guide the drill stem upward with his hand, making sure that it did not hit any member of the drilling crew or some piece of the rig superstructure. On the contrary, the evidence shows conclusively that the soft line parted some one or two feet above its lower end, an event over which plaintiff obviously had no control. Although it is not clear exactly what caused the soft line to part as it did, it seems obvious that either (1) defective line must have been provided for plaintiff's use by his employer, Service Contracting, Inc., or (2) the driller must have negligently raised the block in such fashion as to put an intolerable strain on the line, causing it to break and the drill stem to fall, or (3) some combination of the first two circumstances coincided. Either event, whether occurring alone or in combination with the other, is sufficient to warrant a finding of "negligence" under the Jones Act and "unseaworthiness" under General Maritime Law. Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); Gilmore & Black, The Law of Admiralty, §§ 6–34 to 6–44 (1957); 2 Norris, The Law of Seamen, §§ 610–612, 686 (1962).

Plaintiff may not, however, recover cumulative damages, i. e., for negligence under the Jones Act *and* unseaworthiness under General Maritime Law. He has but one *claim for damages* founded on alternative causes of action.

Brown v. Sinclair Refining Co., 227 F. Supp. 714, 718–719 (S.D.N.Y.1964); Gilmore & Black, The Law of Admiralty, § 6–23, p. 288 (1957). The parties are sharply divided over the extent of plaintiff's injuries. The record shows that plaintiff was hospitalized first from the date of his original admission, January 10, 1969, until he was released on January 17, 1969 to return to his home in Brookhaven, Mississippi. A medical examination conducted on February 7, 1969 by Dr. Louis A. Farber, an orthopedic surgeon, confirmed that plaintiff's principal injury seemed to be a compression fracture of the fourth and fifth dorsal vertebra. Subsequent examinations by other doctors to whom plaintiff was referred by Dr. Farber revealed that he was also suffering from a left inguinal hernia and pneumonia. The hernia was clearly caused by plaintiff's injury on January 9, 1969 and the pneumonia was apparently induced by inadequate ventilation of plaintiff's lungs due to the pain associated with the vertebral injuries. As a result of these examinations, plaintiff was again hospitalized from February 11, 1969 to February 25, 1969 for treatment for pneumonia, and a third time from March 23, 1969 to March 31, 1969 for surgical repair of the left inguinal hernia. At various times he was hospitalized for a total of thirty-two days.

Dr. Farber was of the opinion that the more serious of plaintiff's injuries, the compression fracture of the dorsal vertebra, had reached the optimum point of recovery by October 22, 1969, but that plaintiff would probably continue to experience some degree of residual pain in his back for the remainder of his life. For this reason, Dr. Farber attributed a ten per cent permanent partial disability to plaintiff, although he did in fact conclude, despite the diagnosis of residual pain, that it would still be possible for him to return to his prior occupation as an offshore oilfield worker. Plaintiff continued to complain about several minor but painful ailments which, according to him, were all brought about by his

injury on the SCI Rig No. 1, including headaches, swelling and numbness in his extremities, and pain in his back. At Dr. Farber's suggestion, plaintiff remained under the care of a neurosurgeon and a neurologist for treatment of these ailments until sometime in March, 1970. On January 9, 1970, exactly one year after he was injured, Dr. Lucien R. Hodges, a neurosurgeon, advised him that there was nothing clinically wrong with him and that he could thereafter begin returning to work on a gradual basis. Plaintiff did not, however, see fit to return to his former occupation in the oilfields because, according to him, he continued to experience pain in his back and headaches. On the date of the trial of this case, July 15, 1970, he was unemployed. Defendant takes the position that he could have returned to work as early as October, 1969, but certainly no later than January 9, 1970, the date he was informed by Dr. Hodges that there was nothing clinically wrong with him. It is the opinion of this Court that a preponderance of the medical evidence shows that plaintiff's disability extended from January 9, 1969 to January 9, 1970, and that during this period he was completely unable to perform the tasks normally performed by an offshore oilfield worker. Except for plaintiff's own testimony, there is simply no evidence in the record of this case which shows that he was unable to return to the oilfields after January 9, 1970. We do take note of the fact that the residual pain diagnosed by Dr. Farber and oft-complained of by plaintiff may have indeed made it somewhat uncomfortable for him to return to the strenuous and active life of an offshore oilfield worker, even though there seems to be no doubt that it was medically possible for him to do so. Thus, though plaintiff is not entitled to damages for loss of future earnings due to residual back pain, this circumstance was taken into account in our award of damages for pain and suffering.

The parties have stipulated that plaintiff (1) earned approximately $7,510.00 per year, (2) has been paid all sums to

which he was entitled for maintenance and cure, and (3) has been paid, in addition to the sums advanced for maintenance and cure, the sum of $500.00 against an ultimate award for damages for which sum defendant will be entitled to credit. It is the judgment of this Court that plaintiff is entitled to an award of $7,510.00 for lost earnings from January 9, 1969 to January 9, 1970, plus the sum of $20,000.00 for pain and suffering, less $500.00 previously advanced by defendant, with interest thereon from date of entry of judgment until paid. See Callendar v. Employers Liability Assurance Corp., 283 F.Supp. 213 (E.D.La.1967) and Ledet v. U. S. Oil Co. of Louisiana, 237 F.Supp. 183 (E.D. La.1964). All costs are to be borne by defendant. Judgment will be entered accordingly.