452

McDERMOTT, INCORPORATED,
(Formerly J. Ray McDermott &
Co., Inc.), Petitioner,

v.

Irene BOUDREAUX and Director, Office
of Workers' Compensation Programs,
United States Department of Labor, Respondents.

No. 81–4309.

United States Court of Appeals,
Fifth Circuit.

June 28, 1982.

Joseph W. Looney, John T. Nesser, III, Louis Simon, II, New Orleans, La., for petitioner.

Charles R. Ryan, Houma, La., Joshua T. Gillelan, II, Washington, D. C., for respondents.

Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Once again, we confront the troublesome task of determining whether a deceased maritime employee was a "member of a crew of any vessel" and is, therefore, excluded from coverage under the Longshoremen's and Harbor Workers' Compensation Act (Longshoremen's Act), 33 U.S.C. § 903. The Administrative Law Judge (ALJ) below, in a decision upheld by the Benefits Review Board, found that pipeline welder Clovis Boudreaux was not a crew member of a pipelaying barge because he was not aboard the vessel "primarily to aid navigation." We hold that the ALJ and the Board failed to apply the legal standard used in this circuit to determine crew member's status. We further hold that the undisputed [1]

---

**1.** The facts are undisputed in more ways than one. Despite repeated notices, neither Bou- dreaux nor the Department of Labor, appellees in this case, favored us with briefs or appear-

factfindings of the ALJ, measured against the correct standard, require our conclusion that Boudreaux was, as a matter of law, a crew member of the barge on which he died. Consequently, we set aside the administrative order affording Boudreaux coverage under the Longshoremen's Act.

## I. The Facts

Boudreaux worked for McDermott as a pipeline welder for approximately nine years prior to his death in 1976. Although Boudreaux occasionally worked on one of McDermott's onshore operations during a lull in offshore activity, his principal employment during those ten years was as a pipe welder on several of McDermott's offshore pipelaying barges. As their job title suggests, pipeline welders construct the pipelines that connect offshore wells with onshore distribution facilities. They are essential to the mission of the specially-designed pipelaying barges.

Boudreaux spent part of the summer of 1975, approximately one year before his death, working onshore constructing an aerial crossing (an elevated pipeline) at Whiskey Bay, Louisiana. After working offshore during the fall, he took an optional winter layoff from December 12, 1975 until March 23, 1976. He then reported to work at Bayou Boeuf, Louisiana, and assisted in repairs on board McDermott's Lay Barge 23. The barge, which had suffered ordinary wear and tear during recent opera-

tions in the North Sea, was moored afloat in a slip at McDermott's yard. By June, the repairs were nearing completion and Boudreaux was scheduled to begin work on another barge offshore. Since he had not welded any pipe offshore during the first six months of 1976, however, Boudreaux had to qualify in a welding test on June 16. Two days after passing the test, he collapsed and died of a heart attack while completing his job aboard the moored barge.

Boudreaux' widow filed a claim for benefits under the Longshoremen's Act on March 2, 1977. McDermott contested the claim, arguing that Boudreaux had been a "member of the crew" of McDermott's pipelaying barge fleet and, consequently, did not qualify as an "employee" under the Longshoremen's Act.[2] McDermott also contended that Boudreaux had died from cardiac arrythmia induced by arteriosclerosis rather than from any work-related condition. The ALJ heard the case on May 10, 1979. On August 1, the ALJ awarded the benefits to Mrs. Boudreaux, holding that Boudreaux had been an employee covered by the Longshoremen's Act and that his job had at least contributed to his heart failure. McDermott filed a timely appeal with the Benefits Review Board, but the Board upheld the ALJ on both issues.[3] Pursuant to section 21(c) of the Longshoremen's Act, 33 U.S.C. § 921(c), McDermott has appealed the Board's decision to this court.

---

ances at oral argument. Our rendition of judgment for appellant, however, lies solely on facts found by the ALJ, uncontroverted in the record, and used below to support the judgment for appellee Boudreaux.

**2.** Section 2 of the Act defines the term "employee" as

any person engaged in maritime employment, including any longshoremen or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.

33 U.S.C. § 902(3).

Section 3 of the Act states that "[n]o compensation shall be payable in respect of the

disability or death of—(1) A master or member of a crew of any vessel...." 33 U.S.C. § 903(a)(1).

**3.** The Board also assessed an additional penalty against McDermott, holding that McDermott failed to controvert the claim within fourteen days of acquiring knowledge of Boudreaux' death, as required by § 14(d) of the Act, 33 U.S.C. § 914(d). McDermott argues that the Longshoremen's Act requires not only knowledge that an injury has occurred, but also knowledge that it is job-related.

Because we hold that Boudreaux is excluded from coverage under the Act, we need not decide whether Boudreaux' injury was compensable or McDermott's controversion was timely.

II. The Original Test of Crew Members' Status

As McDermott points out, the ALJ and the Benefits Review Board held the following test to be appropriate for use in determining "crew member" status under the Longshoremen's Act: whether (1) there is a vessel in navigation; (2) the worker has a more or less permanent connection with the vessel; and (3) the worker is on board the vessel primarily to aid in navigation. This frequently cited "three-prong" test apparently was first distilled from earlier caselaw in *Wilkes v. Mississippi River Sand & Gravel Co.*, 202 F.2d 383, 388 (6th Cir. 1953), *cert. denied*, 346 U.S. 817, 74 S.Ct. 29, 98 L.Ed. 344 (1953). The *Wilkes* court fashioned the test as a means of determining whether the decedents of two plaintiffs could qualify as "seamen" under the Jones Act, 46 U.S.C. § 688. However, in describing the issue presented as "whether these cases are governed by the Longshoremen's and Harborworkers' Act ... or by the Jones Act," the court implicitly recognized that the same test necessarily identifies a seaman covered by the Jones Act and a crew member *not* covered by the Longshoremen's Act. This court has concluded "that the same test is to be applied to ascertaining whether a person is a 'seaman' for purposes of Jones Act jurisdiction, or is 'a member of a crew of a vessel' for the purpose of [denying] Longshoremen's Act jurisdiction...." *Hardaway Contracting Co. v. O'Keeffe*, 414 F.2d 657, 659–60 (5th Cir. 1968) (citing *Boatel, Inc. v. Delamore*, 379 F.2d 850, 859 (5th Cir. 1967)). *See also Travelers Insurance Co. v. Belair*, 412 F.2d 297, 302 (1st Cir. 1969) (" 'Seaman,' as used in the Jones Act and 'members of the crew' as excluded from the Longshoremen's Act, are equivalent terms.")

This court first adopted the tripartite standard in *McKie v. Diamond Marine Co.*, 204 F.2d 132, 136 (5th Cir. 1953), and most of the federal circuits who regularly hear maritime actions have used some form of the test. *See, e.g., Salgado v. M. J. Rudolph Corp.*, 514 F.2d 750, 754 (2d Cir. 1975); *Griffith v. Wheeling Pittsburg Steel Corp.*, 521 F.2d 31, 36 (3d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *Whittington v. Sewer Construction Co.*, 541 F.2d 427, 436 (4th Cir. 1976); *Bullis v. Twentieth Century-Fox Film Corp.*, 474 F.2d 392, 393 (9th Cir. 1973). Not surprisingly, however, each prong of the test has generated its share of interpretative controversy.

 Courts have held, for example, that the "vessel in navigation" element does not require the vessel to have been in actual operation at the moment of the injury or death in question. "Case law indicates that a vessel is 'in navigation' although moored to a pier, in a repair yard for periodic repairs, or while temporarily attached to some object." *Griffith, supra*, 521 F.2d at 37 (citing 2 M. Norris, *The Law of Seamen* § 668, at 301–02 (3d ed. 1970); *see also* 1 *Benedict on Admiralty* § 11a, at 2–7 (7th ed. 1981). In *Doucet v. Wheless Drilling Co.*, 467 F.2d 336 (5th Cir. 1972), this court held that a semisubmersible drilling barge temporarily moored for repairs remained a vessel in navigation. *See also Rogers v. United States*, 452 F.2d 1149, 1152 (5th Cir. 1971) (missile tracking ship tied to pier for repairs "in navigation"); *Bodden v. Coordinated Caribbean Transport, Inc.*, 369 F.2d 273, 275 (5th Cir. 1966) (freighter in dry dock for repairs still in navigation).[4] Thus, the facts in the case before us amply justi-

---

4. In *Doucet*, 467 F.2d at 339, we noted that the vessel held to be in navigation was "within the control of the owner, ... it was partially afloat, the repairs were chiefly to drilling equipment, the time was short, and the vessel quickly returned to its drilling function as soon as a contract was secured and before repairs were fully done." In *Rogers*, 452 F.2d at 1152, we emphasized that the magnitude of the repairs and the owner's retention or release of control were important considerations in determining

the vessel's status. In *Bodden*, 369 F.2d at 275, however, we pointed out that "where a vessel is laid up for the winter, the crew having been discharged, and the boat is being secured by workmen paid at an hourly rate and living ashore, the ship is no longer in navigation." Obviously, no single factor controls an evaluation of a vessel's status, although control over the vessel and magnitude of the repairs are important subjects for inquiry.

fied that ALJ's findings that McDermott's Lay Barge 23, which remained afloat and under its owner's control throughout the repair period, was a vessel in navigation.

■ Similarly, the facts developed at the hearing below support the finding that Boudreaux had a more or less permanent connection with the fleet of barges. The testimony showed that Boudreaux had worked on the repairs aboard Lay Barge 23 from the time he returned from his layoff in March to the time of his death. Moreover, Boudreaux had spent most of his time with McDermott as a welder attached to the company's fleet of pipeline barges and was scheduled to return to sea on Lay Barge 21 when he died. "[I]t is well established that one need not be indefinitely and invariably assigned to one vessel in order to achieve the 'permanent' connection required by this prong of the ... analysis. The permanency requirement may be satisfied by assignment to a specific fleet of vessels." *Ardoin v. J. Ray McDermott & Co.*, 641 F.2d 277, 281 (5th Cir. 1981) (citations omitted).

The controversy in our case, then, centers on the third prong of the *McKie* standard, which requires that the worker be aboard primarily to aid in navigation. The ALJ who heard the case observed that Boudreaux had spent only three and one-half months of the year prior to his death working offshore; he had spent the remainder of his time (discounting, presumably, the winter layoff) repairing the moored barge. "However, assuming, *arguendo* that decedent spent twelve months as a pipeline welder," the ALJ continued, "his primary duties then were to fit and weld pipeline extending from oil wells to oil distribution facilities." The ALJ found that these duties did not "primarily aid in navigation" and that Boudreaux was not, therefore, a crew member excluded from coverage under the Longshoremen's Act.

In affirming this construction of the "aid in navigation" prong, the Benefits Review Board added that Boudreaux had been en-

gaged in ship repair work for two months prior to his death, had received lower pay for this work than for his usual offshore duties, had been living ashore, and had not been "engaged in oil pipeline welding, the special function of the vessel." Thus, the Board concluded that "[d]ecedent was clearly a 'shiprepairman' in employer's yard from March 23, 1976, until his death on June 18, 1976."

■ We are forced to conclude that these holdings represent a fundamental misunderstanding of the legal construction that this court has placed upon the phrase "aboard primarily to aid in navigation."[5] While agreeing that "the test for determining whether an employee is a member of a crew is the same test used for determining whether a worker is a Jones Act seaman," the ALJ based his final judgment on a conviction, approved by the Board, that this court's post-*McKie* decisions expanding the concept of Jones Act "seaman" are wholly irrelevant to factual inquiries into crew member's status under the Longshoremen's Act. Relying on the bare language of the familiar three-part test, the ALJ assumed that Boudreaux' responsibilities as a pipeline welder on an offshore barge did not qualify as an aid to navigation. In upholding this conclusion, the Board chose to emphasize that Boudreaux' temporary shift to "ship repair work" on a barge moored at the McDermott yard was sufficient to remove him from the excluded class of crew members. Both views of the law as applied in this circuit are incorrect, since they ignore our interpretation of the "aid to navigation" prong in *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir. 1959), and subsequent decisions.

### III. Enter *Robison*.

As McDermott has insisted throughout these proceedings, this Court's landmark decision in *Offshore Co. v. Robison* culminated in what might be described as a recasting of the tripartite *McKie* test for seaman's sta-

---

5. Since the Board acts in an adjudicatory rather than an enforcement capacity, we need not defer to its construction of the Longshoremen's

Act in reviewing its determinations for errors of law. *See Miller v. Central Dispatch, Inc.*, 673 F.2d 773 at 779 & n.12 (5th Cir. 1982).

tus. Judge Wisdom's opinion began by observing the courts had "expanded the coverage of the Jones Act to include almost any workman sustaining almost any injury while employed on almost any structure that once floated or is capable of floating on navigable waters." 266 F.2d at 771. It further pointed out that the courts had extended this "extremely liberal interpretation to the terms 'seaman' and 'member of a crew of any vessel' without provoking any congressional amendments restricting the coverage of the Act." *Id.* at 774. After a comprehensive review of Supreme Court and federal circuit opinions considering and expanding the meaning of the terms "seaman" and "crew member" under both the Jones Act and the Longshoremen's Act, the court devised the following as a restatement of this circuit's position:

> [T]here is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.

*Id.* at 799 (footnote omitted).

■ Although we have never abandoned the *McKie* test and have continued to quote it, *e.g. Garcia v. Queen, Ltd.,* 487 F.2d 625, 628 n.6 (5th Cir. 1973), *Robison* must be regarded as an essential commentary upon that standard in this Circuit. The two-part *Robison* version was introduced as a threshold test by which a plaintiff could avoid a

summary judgment denying him seaman's status under the Jones Act. However, our subsequent decisions make clear that the *Robison* test, with its broad concept of seaman's status, is to be used not only in deciding whether a case goes to the jury in a Jones Act dispute, but also in delimiting the power of the factfinder to deny or confer such status. Thus, in *Producers Drilling Co. v. Gray,* 361 F.2d 432, 437 (5th Cir. 1966), we relied on *Robison* in affirming a district judge's finding, as a matter of law, that a roustabout working on board a submersible drilling barge was a Jones Act seaman. Obviously, the second prong of *Robison* represents a necessary gloss upon the third prong of *McKie,* and no factfinder—whether jury or judge—can overlook the implications of *Robison* in determining a worker's status. Effectively, "*Offshore Co. v. Robison* ... established in the Fifth Circuit the test for seaman status under the Jones Act." *Abshire v. Seacoast Products, Inc.,* 668 F.2d 832, 835 (5th Cir. 1982).[6]

■ Moreover, *Robison* is fully applicable as a measure of crew member's status under the Longshoremen's Act. In *Boatel, Inc. v. Delamore,* 379 F.2d 850 (5th Cir. 1967), we relied on *Robison* in holding that a diesel motorman aboard a drilling tender was a "member of the crew," and therefore not entitled to Longshoremen's Act benefits, because he was "primarily engaged in performing duties aboard the vessel in fulfilling the function for which the vessel was designed." *Id.* at 858. Pointing out that *Robison* itself had used the terms "seaman" and "member of the crew" interchangeably, we concluded that "[t]he decisions of this Court and the Supreme Courts [sic], in suits under the Jones Act which have decided whether or not a claimant is under the coverage of that Act, are directly applicable here in determining the meaning of the term 'member of the crew' for purposes of

---

**6.** A panel of this court recently examined a Jones Act claim using what it referred to as a "*McKie/Robison* analysis." *Ardoin, supra,* 641 F.2d at 281. As if to complete the conjunction of the old and the new, other panels have preferred to edit the two-part statement of *Robison* into a three-pronged standard reminis-

cent of *McKie. See Barrios v. Engine & Gas Compressor Services, Inc.,* 669 F.2d 350, 352 (5th Cir. 1982); *Watkins v. Pentzien, Inc.,* 660 F.2d 604, 606 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2010, 72 L.Ed.2d 467 (1982).

exclusion under the Longshoremen's Act." *Id.* at 859.

■ Considering *Robison's* longstanding and vital importance to this Court's interpretation of the Longshoremen's Act, we are at a loss to understand the total disregard of *Robison* and its progeny in the proceedings below. The ALJ's assumption that a pipeline welder working on board a pipelaying barge is not employed "primarily in aid of navigation" is clearly out of keeping with the language of *Robison* and our subsequent interpretations of that decision. Building on the tenet that seaman's status is not restricted to those who "hand, reef, and steer," *Norton v. Warner*, 321 U.S. 565, 572, 64 S.Ct. 747, 751, 88 L.Ed. 931 (1944), this court has relied on *Robison* in approving the extension of seamen's or crew member's status to a number of occupations whose members perform no such traditional navigational chores but nevertheless contribute to the function, mission, or maintenance of a vessel in navigation. *See, e.g., Landry v. Amoco Production Co.*, 595 F.2d 1070 (5th Cir. 1979) (offshore roustabout who operated boat in connection with work); *Davis v. Hill Engineering, Inc.*, 549 F.2d 314 (5th Cir. 1977) (welder's helper on offshore gas gathering station); *Neill v. Diamond M. Drilling Co.*, 426 F.2d 487 (5th Cir. 1970) (motorman on drilling barge); *Noble Drilling Corp. v. Smith*, 412 F.2d 952 (5th Cir. 1969), *cert. denied*, 369 U.S. 906, 90 S.Ct. 221, 24 L.Ed.2d 182 (1969) (mud pumper on drilling tender). In *Jenkins v. Aquatic Contractors & Engineers*, 446 F.2d 520, 521 (5th Cir. 1971), we affirmed a district court's holding that the plaintiff, a welder on a pipelaying barge, "was a *Robison* seaman as a matter of law...." *See also Welch v. J. Ray McDermott & Co.*, 336 F.Supp. 383 (W.D.La.1972) (welding inspector on pipelaying barge a "seaman").

■ Similarly inexplicable is the Board's assumption that Boudreaux' temporary assignment to repair duties aboard the moored barge dissociated him from the barge fleet's crew. If Boudreaux was normally a crew member of these barges during their missions at sea, as he surely was,

there is no reason to presume that he suddenly metamorphosed into a harbor worker or "shiprepairman" just because his employer temporarily used him to prepare a damaged vessel for its next voyage. As the Supreme Court explained in *Senko v. La Crosse Dredging Corp.*, 352 U.S. 370, 373, 77 S.Ct. 415, 417, 1 L.Ed.2d 404 (1957):

> Even a transoceanic liner may be confined to berth for lengthy periods, and while there the ship is kept in repair by its "crew." There can be no doubt that a member of its crew would be covered by the Jones Act during this period, even though the ship was never in transit during his employment. In short, the duties of a man during a vessel's travel are relevant in determining whether he is a "member of a crew" while the vessel is anchored.

Following this reasoning in *Doucet v. Wheless Drilling Co.*, 467 F.2d 336 (5th Cir. 1972), we affirmed a summary judgment (confirming seaman's status) for a member of the drilling crew on a semisubmersible barge. The employee had been injured while assisting with repairs to the barge, which had suffered damages in a hurricane and was moored temporarily to the bank. We agreed with the district court that "[p]laintiff's status as a seaman, by reason of being an offshore oil worker on a semisubmersible drilling barge, was not lost because he was on temporary assignment in his employer's service to do repair work with the intent of returning to an offshore seaman's work." 467 F.2d at 338–39.

■ We conclude, therefore, that Boudreaux, like Doucet, was a member of the barge crew as a matter of law. The evidence showed that Boudreaux had worked for McDermott as an offshore pipeline welder for nine years. Emory Belton, Boudreaux' supervisor, testified that pipeline welders ordinarily spend over ninety percent of their time offshore and work in the repair yard only when maintenance work is necessary "to keep the equipment up so it's functioning properly when [the crew gets] offshore." Although the ALJ reasonably found that Boudreaux himself had spent

"no more than three and one-half months" of the year prior to his death working offshore, the undisputed evidence also showed that Boudreaux had spent most of his actual working time (not including the winter layoff) that year employed on board a McDermott barge, either at sea or beside the bank. At the time of his death, he was temporarily engaged in repair work aboard Lay Barge 23, readying it for future service offshore. According to the ALJ's own findings, Lay Barge 23 remained "in navigation" throughout this repair period and Boudreaux maintained a permanent association with it. His job classification as a pipeline welder never changed. In fact, only two days before his fatal heart attack he re-qualified to return to sea aboard Lay Barge 21. Given these uncontroverted facts, one cannot escape the conclusion that Boudreaux was (1) a member of the crew of Lay Barge 23, or at least of the fleet of which Lay Barge 23 was a unit, in that his duties contributed "to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips," *Robison*, 266 F.2d at 779, and (2) a member of the crew of the barge fleet in general, in that his duties as a pipeline welder contributed "to the function of the vessel[s] or to the accomplishment of [their] mission. . . ." *Id.* As such, he is barred from coverage under the Longshoremen's Act.

■ In excluding Boudreaux from coverage, we wish to emphasize our recognition that the Longshoremen's Act, like the Jones Act, requires a liberal interpretation in favor of claimants to effect its purposes. *See, e.g., Voris v. Eikel*, 346 U.S. 328, 333, 74 S.Ct. 88, 91, 98 L.Ed. 5 (1953). We do not lightly exclude workers from coverage as a matter of law under either statute. Thus, despite our continued insistence that a Jones Act "seaman" and a "crew member" excluded from the Longshoremen's Act are one and the same (in other words, that the statutes are mutually exclusive) we realize that, in a practical sense, a "zone of uncertainty" inevitably connects the two Acts. Confronted by conflicting evidence concerning a worker's duties or undisputed evidence concerning an occupation that exhibits the characteristics of both traditional land and sea duties, a factfinder might be able to draw reasonable inferences to justify coverage under *either* statute.[7] Were this possibility present here, we would remand this case for further factual development at the administrative level and reconsideration in light of our emphasis upon *Robison, Jenkins, Doucet,* and other precedent in this Circuit.

This is not, however, what we recently described in *Abshire v. Seacoast Products, Inc.,* 668 F.2d 832, 835 (5th Cir. 1982), as "a close case." *Abshire* offers a classic instance of the case that could have gone either way. Plaintiff produced evidence that he was a marine welder and mechanic permanently assigned to a fleet of fishing vessels and spent most of his time performing repairs aboard the employer's boats; defendant produced evidence that plaintiff was a shore-based maintenance employee who never went to sea and whose only contact with vessels under way "was in testing them in connection with repairs and maintenance." *Id.* at 836. The district court properly submitted the issue to a jury, which found that the welder/mechanic was entitled to damages as a Jones Act seaman. Although we affirmed the judgment, we just as easily could have approved a jury's finding that Abshire was restricted to compensation under the Longshoremen's Act. Incidentally, the judgment for Abshire under the Jones Act also ordered repayment of two insurers that already had compensated him under the Longshoremen's Act.

---

**7.** Even the ambiguous employee must elect a remedy, however. Section 5 of the Longshoremen's Act, 33 U.S.C. § 905, provides that the employer's liability under the Act is an exclusive remedy. Thus, we have held that the Longshoremen's Act and the Jones Act are "mutually exclusive," *Bodden, supra,* 369 F.2d at 274, and that establishment of an employer's liability under the Longshoremen's Act "effectively abrogates any independent tort liability of the employer to its employees. . . ." *Ocean Drilling & Exploration Co. v. Berry Brothers Oilfield Service, Inc.,* 377 F.2d 511, 514 (5th Cir. 1967), *cert. denied,* 389 U.S. 849, 88 S.Ct. 102, 19 L.Ed.2d 118 (1967).

The case before us presents no such factual or legal uncertainties, particularly when reviewed against past decisions of this court resolving similar disputes over the classification of comparable duties. "The proper legal standard coupled with undisputed facts showing plaintiff's substantial work relating to vessels in navigation makes clear that reasonable persons could not conclude that [plaintiff] was not a seaman." *Landry v. Amoco Production Co.*, 595 F.2d 1070, 1074 (5th Cir. 1979). We hold, therefore, that Boudreaux is excluded from coverage under the Longshoremen's Act as a matter of law, and we SET ASIDE the Board's order. *See, e.g., Dravo Corp. v. Banks*, 567 F.2d 593, 596 (3d Cir. 1977).

GARWOOD, Circuit Judge, concurring in part and dissenting in part:

I agree with most of the majority's persuasive opinion, and specifically with its holdings that the Jones Act and the Longshoremen's Act are mutually exclusive, that the Administrative Law Judge [ALJ] applied an incorrect legal standard in not following the *Offshore Company v. Robison*, 266 F.2d 769 (5th Cir. 1959) "contributed to the function of the vessel or to the accomplishment of its mission" test, and that as a matter of law one who is a pipeline welder on a pipelaying marine barge is a seaman and a member of the crew of the vessel. I also agree that, due to the ALJ's error, the ruling for the claimant cannot be affirmed. However, in my opinion, we should not render judgment for McDermott, but should remand this case to the ALJ for further findings, as he apparently tried the entire case under a basic misapprehension of the applicable law and as a result never properly focused on the controlling factual issues.

As the opinion of the Review Board reflects, the claimant took the position that Boudreaux had worked for McDermott (which is engaged in shipbuilding, ship repair, and other businesses, as well as in the shipping business) in two different and distinct capacities, each at different times: (1) a pipeline welder, in which capacity he went to sea on a pipeline laying barge and there welded the pipe which the barge was laying to connect the offshore wells to the shore; and (2) a ship repairman, in which capacity he was shore based and performed various jobs, including the repair of barges. It was claimant's theory that Boudreaux was employed as a ship repairman when he died, and that in such capacity he was not a seaman or a member of a crew of a vessel. McDermott's position was that Boudreaux was, at all times, a pipeline welder whose job was to weld pipe aboard a marine pipeline laying barge, and that although he was performing shore based ship repair services when he died, this was merely a temporary assignment, and he nevertheless retained his status as a pipeline welder more or less permanently assigned to its fleet of barges for sea duty in such capacity on them. If McDermott's theory were factually correct, then it was entitled to judgment, for plainly under *Robison* a marine barge pipeline welder is a seaman. If, however, the claimant's theory were factually correct, then when Boudreaux died he was not a seaman. The ALJ did not focus on, or resolve, this factual dispute, because in his view of the law it was *irrelevant* since he rejected *Robison* and considered that at his death Boudreaux would not have been a seaman *even if* he *were* then in the status McDermott claimed he was, that is, a pipeline welder.

The pertinent parts of the ALJ's opinion are as follows (numbers in brackets inserted for ease of reference):

"[1] In this case I have found that decedent, in the year preceding his death, spent no more than three and one-half months as an offshore pipeline welder on Lay Barge 23 and the remainder working shoreside in the yard on repair, refurbishing or remodeling work on the barge. [2] However, assuming, *arguendo*, that decedent spent twelve months as a pipeline welder, his primary duties then were to fit and weld pipeline extending from oil wells to oil distribution facilities. Therefore, I find that decedent was not aboard Lay Barge 23 primarily to aid in navigation and, consequently, is not precluded from coverage as a member of the crew.

" . . . .

"[3] The barge upon which the decedent was working was a vessel within the meaning of the Act. *Norton v. Warner Co.*, 321 U.S. 565 [64 S.Ct. 747, 88 L.Ed. 931] (1944). Furthermore, the barge was in navigation.... [4] Furthermore, I find that decedent had a more or less permanent connection with Lay Barge 23 although, for a significant portion of the year preceding his death, decedent was not earning the much higher pay of a pipeline welder and there is evidence his job title remained the same.

" . . . .

"[5] For several months prior to his death decedent had been engaged in maintenance, repair, refurbishing and remodeling work on Lay Barge 23. Employer is a substantial company engaged in shipbuilding, ship repair and other maritime functions, performed by various divisions of the Employer. Although decedent was nominally employed by Employer's pipeline Division, the nature of his duties at the time of death is controlling herein, and not necessarily which division pays his salary. Decedent was engaged in ship repair and maintenance work during the pipeline slow season and I conclude and find that Employer has satisfied the situs [as the Review Board notes, "status" is intended] requirement. Employer should not be permitted to defeat coverage by assigning divisional nomenclatures to the various maritime functions performed by the Employer [*sic*] and its employees." [Footnote omitted.]

Those parts of the ALJ's opinion designated by [1] and [5] above appear to indicate that Boudreaux was not a pipeline welder when he died, but rather a ship repairman. The language at [2] seems, in effect, to say, "but even if he were a pipeline welder it would make no difference." The language at [4], on the other hand, suggests a finding that Boudreaux was a seaman under the *Robison* test. This finding, however, does not specify in what *capacity*—as pipeline welder or ship repairman—Boudreaux had "a more or less permanent connection with Lay Barge 23." Lay Barge 23 had been undergoing repairs

for about a month or two before Boudreaux started to work on her, and the repairs continued for some six weeks after his death. In all she would be under repair at least six months. Boudreaux was not a member of her crew when she came in for repairs. And, as the majority opinion notes, if Boudreaux had gone to sea it would have been on barge 21, not on barge 23. So far as I can determine, the ALJ never found that Boudreaux had a more or less permanent connection as a pipeline welder to a fleet of pipeline laying barges.

The Review Board apparently construed the ALJ's opinion as finding Boudreaux "was clearly a 'ship repairman' in employer's yard from March 23, 1976 until his death on June 18, 1976."

It is simply impossible to determine with confidence just what the ALJ found, or to what extent his findings were infected by his erroneous disregard of *Robison*. Accordingly, the rulings below having been for the claimant, I would not render judgment for McDermott, but would rather remand so that the ALJ could consider the case in light of the correct legal rules.

Of course, if on this record Boudreaux was a seaman *as a matter of law*, then a remand would be pointless and judgment should be rendered for McDermott. But in my view, the facts of this case do not establish Boudreaux's seaman status as a matter of law.

As the majority recognizes, the issue of seaman status is usually a question of fact. In *Senko v. La Crosse Dredging Corporation*, 352 U.S. 370, 374, 77 S.Ct. 415, 417, 1 L.Ed.2d 404, 408, (1957), the Supreme Court said "the determination of whether an injured person was a 'member of a crew' is to be left to the finder of fact...." In *Bodden v. Coordinated Caribbean Transport, Inc.*, 369 F.2d 273, 275 (5th Cir. 1966), this Court stated:

"Whether a person is a seaman depends largely on the facts of a particular case, or as stated, on the totality of circumstances. *It would be the rare factual situation where the question could be resolved as a matter of law.*" [Emphasis added.]

More recently, Judge Rubin wrote for this Court as follows in *Guidry v. South Louisiana Contractors, Inc.*, 614 F.2d 447 (5th Cir. 1980):

"Turning first to the question of the effect of the assignment to work ashore, *how long a seaman's status continues after a shoreside assignment is itself a fact question dependent on such factors as the duration of the assignment,* its relationship to the employer's business, whether the employee was free to accept or reject it without endangering his employment status and any other factors relevant to the ultimate inquiry: at the moment of injury was the employee a seaman by conventional Jones Act criteria who happened not to be on navigable waters, or was he at that time no longer a seaman *whatever his past relationship or his future prospects?*

". . . .

"Because *seaman status ordinarily is a jury question,* a court may rarely conclude as a matter of law that an individual is or is not a seaman within the meaning of the Jones Act. *Barrios v. Louisiana Construction Materials Co.,* 465 F.2d 1157, 1162 (5th Cir. 1972). . . .

"But for Guidry's prior relationship to a Soloco vessel and his expectation of returning to it, he could not have been a seaman when he was injured. These were necessary conditions for establishing Guidry's seaman's status but they were not alone sufficient. *It was also necessary that he establish* that Soloco continued to be his employer and *that the nature of his assignment ashore did not sever his vessel connection* and thus end his maritime status. The jury found that Soloco had temporarily assigned Guidry to perform work on the land with the intention that he return to work on the barge at the completion of the job. The court, however, did not define what was

meant by the term 'temporarily' and the jury did not decide the basic question whether Guidry was a seaman when he was injured." [614 F.2d at 453–54; emphasis added.]

Here the circumstances supportive of a factual conclusion that Boudreaux was not a seaman when he died include the following: (a) for over six months next preceding his death, he had neither worked as a pipeline welder nor been at sea; (b) in the year before his death, he worked offshore as a pipeline welder only some three and one-half months, but worked nearly six months, three of which were immediately before his death, as a shore worker or ship repairman; (c) as a ship repairman he was paid a significantly lower wage than as a pipeline welder and in the former capacity he lived at home and commuted to work; (d) barge 23, on which Boudreaux was working as a ship repairman when he died, was not then ready to go to sea and did not do so until some six weeks after his death, having then been under repairs for about six months; (e) while under repair, barge 23 did not have a crew assigned to it; (f) when it came in for repairs, Boudreaux was not a member of its crew; (g) McDermott, Boudreaux's employer, was engaged in the shipbuilding and ship repair business, as well as in the business of owning and operating vessels, and clearly has ship repair employees who are not seamen.

Of course, in certain cases the facts shown may establish seaman status, or the lack of it, as a matter of law.[1] But such are rare instances, especially where, as here and in *Guidry,* the question is "how long a seaman's status continues after a shoreside assignment," or whether "the nature of his assignment ashore did not sever his vessel connection." Moreover, I am aware of no case with facts remotely comparable to those here which has held an individual in circumstances such as Boudreaux's to be a seaman *as a matter of law.* Certainly, *Dou-*

---

1. For example, in *Guidry* the plaintiff was held as a matter of law not to be a seaman employee of his shore based "borrowing" employer; whether he was a seaman employee of his "lending" employer vessel owner was held to be a question of fact. If Boudreaux had been injured while at sea on the barge employed as a pipeline welder he would, of course, have been a seaman as a matter of law. *See Porche v. Gulf Miss. Marine Corp.,* 390 F.Supp. 624, 630–31 (E.D.La.,1975) (Rubin, J.).

*cet v. Wheless Drilling Company*, 467 F.2d 336 (5th Cir. 1972), furnishes no support for holding that Boudreaux was a seaman as a matter of law. The Jones Act plaintiff in *Doucet* was concededly a member of its crew when the vessel came into port on September 10, and he was injured while doing repair work (along with some other members of the same drilling crew) on this same vessel (chiefly its drilling equipment) six days later. The vessel went back out to sea on September 29 with the same crew. Nothing in the opinion indicates plaintiff was paid a lower wage rate while doing the repairs or that he was not quartered on the vessel. Even in those circumstances, this Court felt it appropriate to support its holding, sustaining a summary judgment ruling that plaintiff was a seaman, with the following alternative ground:

> "If, however, the trial judge erred in his summary dispositions on these limited issues, Wheless [the ship owner] still was allowed to introduce additional evidence at trial, and the court made painstaking findings, and then corrected findings, based on all the evidence. Indeed, Wheless has had several bites at the same apple." [467 F.2d at 339.]

*Doucet*, then, is plainly a case at one end of the continuum, barely over the line allowing seaman status determination as a matter of law. Boudreaux's situation is clearly far removed. The opinion in *Doucet* actually supports the proposition that Boudreaux cannot be said to be a seaman as a matter of law.[2]

---

2. In *Bodden* this Court appears to have been placed at the *other* end of the continuum, where nonseaman status appears as a matter of law, the following situation, which in many respects is similar to that here, viz:

> "... where the vessel is tied up for the winter with only a maintenance crew, and claimant, a crew member during the season, is retained as a laborer on an hourly basis and is not required to live aboard the vessel." [369 F.2d at 273.]

While the quoted *Bodden* passage most directly pertains to the vessel "in navigation" aspect of seaman status, it also recites factors relevant to the relationship between the claimant and the vessel. *See also Desper v. Starved Rock Ferry Co.*, 342 U.S. 187, 191, 72 S.Ct. 216, 218, 96 L.Ed. 205, 209–10 (1952):

Accordingly, while I agree with the reversal of the award in favor of the claimant, as the ALJ applied an incorrect legal test in determining that Boudreaux was *not* a seaman, I dissent from the rendition of judgment for McDermott on the basis that Boudreaux *was* a seaman. The fact finder determined that Boudreaux was *not* a seaman. His status as a seaman has been established neither as a matter of law nor by fact-findings which can be characterized with any confidence as responsive to the controlling legal issues and uninfluenced by an erroneous view of the law. Accordingly, I would reverse and remand the case to the ALJ for appropriate findings.

> "... he was a probable navigator in the near future, but the law does not cover probable or expectant seamen but seamen in being. It is our conclusion that while engaged in such seasonal repair work Desper was not a 'seaman' within the purview of the Jones Act. The distinct nature of the work is *emphasized* by the fact that there was no vessel engaged in navigation at the time of the decedent's death." [Emphasis added.]

Note that the Supreme Court says "is emphasized by," not "arises from" or "consists of" or "is established by" or other language indicating that the decision was exclusively, or even primarily, based on the fact that there was no vessel then "in navigation."