Jethro **BARRETT**, Plaintiff,

v.

**CHEVRON, U.S.A., INC., E.B.B. Co., Inc., and Lift Barge, Inc., et al.,** Defendants-Appellees,

v.

**MARYLAND CASUALTY CO.,** Intervenor-Appellant.

No. 82–3693.

United States Court of Appeals, Fifth Circuit.

Feb. 4, 1985.

Rehearing En Banc Granted April 9, 1985.

E. Grady Jolly, Circuit Judge, dissented and filed opinion.

Gee, Circuit Judge, specially concurred and filed opinion.

from the district court. Accordingly, we decide    the fee issue ourselves.

Frederick R. Bott, Eileen R. Madrid, New Orleans, La., for plaintiff.

Thomas J. Grace, Charles V. Guilbault, New Orleans, La., for Life Barge, et al.

Richard A. Cozad, Michael L. McAlpine, New Orleans, La., for E.E.B.

Lloyd C. Melancon, New Orleans, La., for Chevron U.S.A.

Before GEE, WILLIAMS and JOLLY, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

In this appeal we must determine whether the injured plaintiff was a seaman. This action was brought by Jethro Barrett, a welder's helper, who was injured in the course of his employment while participating in the repair of an offshore structure. With the exception of the intervenor-insurer, Maryland Casualty Co., in its capacity of compensation insurer, all parties have reached a settlement. The only remaining question is whether Maryland is entitled to reimbursement against the settlement proceeds for payments made to Barrett. Under the settlement agreement, Maryland waived any right to reimbursement in its capacity as Jones Act insurer. We affirm the holding of the district court that Barrett was a Jones Act seaman, and that Maryland has thereby waived any right of reimbursement pursuant to the settlement agreement.

## I. *FACTS*

In 1979, Tilden J. Elliott Contractor, Inc. ("Tilden") contracted with Chevron, U.S.A., Inc. to provide welding crews for maintenance and repair work to offshore platforms and other structures in Chevron's Bay Marchand Field located in the Gulf of Mexico off the coast of Louisiana. Plaintiff, Barrett, was an employee of Tilden who performed services as a welder's helper under the contract between Tilden and Chevron. On one particular assignment, Tilden was to perform welding services on a caisson located approximately ten to twelve miles offshore. The caisson was a small fixed structure, measuring only ten by fifteen feet, comprised basically of one producing well which was tied into the underwater pipeline system in the field. Barrett was a member of the Tilden welding crew assigned to perform welding operations on the caisson.[1]

Because of the small size of the caisson, a jack-up barge, the D/B FALCON, was positioned alongside the caisson in order to provide space on which the necessary equipment and materials for the Tilden crew could be placed and to provide a work area for the crew. The D/B FALCON was the only barge assigned to the Chevron Bay Marchand Field. The vessel would remain stationary at one job site until an assignment was completed, and then move on to the next site.

The Tilden crew was assigned to the caisson to remove old parts and to fabricate and attach new parts. The only work performed on the caisson itself was the cutting of the old pipe from the caisson and replacing it with the new pipe. The old parts, after removal, were brought by one of the D/B FALCON's two cranes back to the D/B FALCON where they were measured and new pipes were fabricated. Barrett spent seventy to eighty percent of his time on the D/B FALCON assisting in the measuring and fabricating of new pipe sections.

During the fourteen day offshore hitch, the Tilden crews were provided living quarters on a large fixed platform called Mike's Structure. Each morning, the crew boat M/V LADY JUNE, owned and operated by E.B.B. Company, transported the crew members from Mike's Structure to their respective work sites. Crew members ate lunch at the job site and at the end of each day's shift, were transported back to Mike's Structure to eat and sleep.

On the morning of May 23, 1979, Barrett, along with the rest of the Tilden crew, was transported by the crew boat M/V LADY JUNE to the caisson under repair. Crew members were transferred from the M/V

---

1. The crew included four welders and three welder's helpers who worked in "hitches" of fourteen days offshore followed by seven days on land.

LADY JUNE to the D/B FALCON by means of a personnel basket. The basket was lifted by a crane located on the D/B FALCON. While being transferred from the M/V LADY JUNE to the D/B FALCON in the personnel basket, Barrett injured his back. Despite this injury, Barrett continued to perform his duties and returned to the D/B FALCON the following day to perform his usual assignments. On that day, while assisting a co-worker in lifting a heavy piece of pipe, Barrett suffered further injury to his back and was taken from the offshore work site to seek medical care. This second injury or aggravation was sustained while Barrett was aboard the D/B FALCON.

Barrett brought a personal injury action originally against Chevron, owner of the production platform, E.B.B. Company, Inc., owner and operator of the M/V LADY JUNE, and Lift Barge, Inc., owner and operator of the D/B FALCON. Barrett alleged that the D/B FALCON crane operator, an employee of Lift Barge, caused the personnel basket to strike the deck of the M/V LADY JUNE with greater than usual force resulting in injury to Barrett. Barrett claimed that his injury was subsequently aggravated by lifting the pipe on board the D/B FALCON. Barrett and his wife then filed a second suit for the aggravation of the injury against Tilden and Lift Barge.[2] Plaintiffs sought damages under the Jones Act and general maritime law for negligence and unseaworthiness, and maintenance and cure. The two actions were eventually consolidated.

Over a three-year period following Barrett's injury, Maryland Casualty Company made payments to Barrett totalling $50,-000. These payments were made pursuant to an insurance policy between Maryland and Tilden, Barrett's employer. Maryland intervened in the consolidated action as the insurer of Tilden, seeking reimbursement of what Maryland characterized as compensation and medical benefits paid to on or behalf of Barrett. With the exception of Maryland's intervention for reimbursement of compensation, all claims were settled in the sum of $150,000. Under the terms of the settlement, Maryland waived any right to reimbursement in its capacity of Jones Act insurer, reserving only the right to recovery as insurer of claims under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901–49 (1946) ("LHWCA"). Also under the settlement, E.B.B. and Lift Barge agreed to defend and hold harmless all parties from the intervention of Maryland.

Maryland maintains that the payments to Barrett were intended as longshoreman's compensation, and that Maryland was entitled to reimbursement for these benefits against Barrett's settlement proceeds. In a non-jury trial, the court found that Barrett was a Jones Act seaman and that Maryland was not entitled to reimbursement of the benefits it had paid him.[3] Maryland's appeal followed.

*Barrett's Seaman Status.*

██ An injured person claiming the benefits of the Jones Act, 46 U.S.C. § 688 (1976), has the burden of establishing seaman status. *Bernard v. Binnings Construction Co., Inc.*, 741 F.2d 824 (5th Cir. 1984); *Billings v. Chevron U.S.A. Inc.*, 618 F.2d 1108, 1109 (5th Cir.1980). The judicially established test for determining seaman status first announced in *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir.1959), remains in force in this circuit with minor modification. Under our most recent articulation of the seaman status test, a maritime worker must have a more or less permanent connection with a vessel or fleet

**2.** Mrs. Barrett sought damages for loss of consortium and society.

**3.** Implicit in the district court's ruling is a finding that payments to Barrett had been made by Maryland in its capacity of Jones Act insurer rather than as compensation insurer under the Longshoreman and Harbor Workers Act. Maryland was not the only compensation insurer of Tilden but was also the primary Jones Act insurer. Tilden's excess Jones Act insurer, Admiral Insurance Company, also assisted in the defense of Tilden.

of vessels in navigation.[4] Further, the capacity in which he is employed or the duties which he performs must contribute to the function of the vessel, the accomplishment of its mission, or its maintenance during its movement or during anchorage for its future trips. *Bernard*, 741 F.2d at 827. *Barrios v. Engine & Gas Compressor Services, Inc.*, 669 F.2d 350, 352 (5th Cir.1982).

■ We first consider whether Barrett had a more or less permanent connection with a vessel in navigation. Maryland contends that Barrett's primary connection was with the caisson rather than with the jack-up barge D/B FALCON. The caisson on which Barrett was carrying out repairs at the time of his injury was a fixed structure. Fixed platforms are treated as artificial islands and, as such, are not vessels. Workers assigned to such platforms therefore do not qualify for seaman classification. *Bertrand v. Shell Oil Co.*, 489 F.2d 293, 295 (5th Cir.1974); *Bertrand v. Forest Oil Corp.*, 441 F.2d 809, 811 (5th Cir.), *cert. denied*, 404 U.S. 863, 92 S.Ct. 106, 30 L.Ed.2d 107 (1971). Thus, Barrett can only qualify as a seaman if he was more or less permanently assigned to the D/B FALCON, and not to the platform.

■ Barrett spent approximately seventy to eighty percent of his time on the D/B FALCON while the caisson was under repair. Clearly, he did not spend a substantial part of his time on the caisson itself. Yet Maryland argues that for purposes of determining seaman status, workers involved in platform-*related* assignments should be classified the same as workers who actually carry out their assignments on the platform itself. Although Barrett may have been physically present on the jack-up barge, Maryland points out that his work was primarily related to the repair of a fixed platform, and that Barrett should therefore not be deemed a seaman. By

this argument, Maryland seeks to extend the fixed platform worker's non-seaman status to those who work on vessels or other structures in connection with fixed platform activities.

Although individuals working on fixed platforms do not have seaman status, no decision has gone so far as to exclude from the definition of seaman an individual working near or adjacent to such platforms where these workers actually perform a substantial part of their work on a Jones Act vessel. Because the benefits afforded seamen are generally considered preferable to remedies available to non-seaman maritime workers, denying seaman status to platform workers has been narrowly restricted to workers who performed a substantial part of their duties on a fixed platform. *See* Robertson, *Injuries to Marine Petroleum Workers: A Plea for Radical Simplification,* 55 Tex.L.Rev. 973, 982–996 (1977).

Decisions such as *Roberts v. Williams-McWilliams Co., Inc.*, 648 F.2d 255 (5th Cir.1981), control this case. Roberts was a welder who worked on a barge located in the Gulf of Mexico employed in the fitting, fabricating, and repair of dolphins. A dolphin is a flotation device to which vessels arriving at an offshore platform tie up. It serves the dual function of permitting passage to and from the platform and protecting the platform from damage. During the day, Roberts performed his duties on the barge alongside the dolphin and at night was taken by crew boat back to sleeping quarters on another barge. Roberts was injured when he slipped and fell aboard the barge that served as his sleeping quarters. The court held that Roberts was a seaman as a matter of law and that the district court erred in denying Robert's motions for directed verdict and judgment n.o.v. This was so even though the structure under

---

4. The articulation of the seaman status test requiring a "more or less permanent connection" with a vessel in navigation combines two lines of cases that developed out of *Robison.* In *Robison,* this court stated that a Jones Act claimant had to establish either that he was permanently assigned to the vessel *or* that he per-

formed a substantial part of his work on the vessel. *Id.* at 799. This gave rise to one line of cases dealing with the permanency of assignment and another line of cases dealing with the substantiality of an individual's work on a vessel. Either line of cases can be used to satisfy "more or less permanent connection" criterion.

repair was appurtenant to a drilling platform.

The facts in this case even more convincingly establish the plaintiff's seaman status then do the facts in *Roberts*. *Roberts* worked near a sizeable fixed platform, the caisson here was an entirely isolated structure too small to accommodate workers on it. The fiction of the artificial island would have doubtful application to such a structure.

■ We next consider whether Barrett was more or less permanently assigned to the D/B FALCON. The word "permanent" has never been given a literal interpretation under the Jones Act, and we have held that the permanency requirement of the seaman status test should not be given a "wooden application." *Prinzi v. Keydril, Co.*, 738 F.2d 707, 709 (5th Cir.1984); *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 327 (5th Cir.1977); *Brown v. ITT Rayonier, Inc.*, 497 F.2d 234, 237 (5th Cir.1974). The permanency test has been characterized as being "more frequently an analytical starting part than a self-executing formula." *Brown*, 497 F.2d at 237. The purpose of the permanency requirement is to ensure that a party seeking seaman status has more than a transitory connection with a vessel or a specific group of vessels. *Ardoin v. J. Ray McDermott & Co.*, 641 F.2d 277, 281 (5th Cir.1981); *Davis v. Hill Engineering, Inc.*, 549 F.2d at 326.

Maryland argues that our decision in *Longmire v. Sea Drilling Corp.*, 610 F.2d 1342 (5th Cir.1980), is dispositive on the permanency issue and precludes classification of Barrett as a seaman. Longmire was a roughneck on an offshore drilling crew assigned to a drilling platform on the Outer Continental Shelf. The drilling installation consisted of a drilling platform permanently affixed to the ocean floor and a tender which was anchored alongside and connected to the drilling platform, the tender provided crew quarters, mess facilities, and drilling equipment. All drilling was conducted entirely on the drilling platform, and Longmire's duties were primarily performed on the platform. Longmire

occasionally worked on the tender to perform general maintenance work or to move supplies to and from the drilling platform. At the time Longmire was injured, no drilling was underway. The crew was in the process of dismantling the drilling rig to move it to another location in the Gulf. On the day of his injury, Longmire had spent his entire shift aboard the tender preparing for the transfer of the rig.

In *Longmire*, summary judgment denying plaintiff seaman status was affirmed. The Court relied primarily on Longmire's own admission that his primary responsibilities related to drilling operations that were performed on the drilling platform, and that his work aboard the tender was only incidental to his duties on the drilling platform. *Id.* at 1346. Therefore, Longmire was neither permanently assigned to the tender nor did he perform a substantial part of his work thereon. Although Longmire's duties necessarily carried him on to the tender from time to time, a substantial part of his work was performed on the drilling platform. The Court refused to find that his presence on the tender at the time of his injury automatically endowed him with seaman status.

This case presents a reverse image of *Longmire*. In *Longmire*, the plaintiff, although actually injured on the tender adjacent to the drilling platform, worked primarily on the platform. Barrett, however, performed a high percentage of his duties on the jack-up barge and not on the adjoining caisson. In *Longmire*, a drilling platform large enough to accommodate workers was serviced in part by the tender. The caisson in this case was too small to accommodate any members of the crew, so the crew, including Barrett, had to perform their functions primarily from the jack-up barge.

■ Maryland also contends that Barrett's connection with the D/B FALCON was temporary and fortuitous in that Barrett was required to work on the barge for that particular assignment only because of the unusually small size of the caisson. Although it is true that the barge was only

used in connection with the caisson during the five or six days it was being repaired,[5] the D/B FALCON moved regularly from one location to the next within the Bay Marchand Field, and Barrett had on several occasions before he was injured worked on the D/B FALCON at these other locations. Working on the jack-up barge was a regular part of Barrett's assignment and was not fortuitous in nature. We conclude that Barrett's connection with the D/B FALCON was sufficiently permanent to qualify him for seaman status.

■ Maryland also argues that Barrett did not perform duties upon the D/B FALCON that contributed to the function or mission of that vessel, as required to qualify as a seaman. *See Bernard,* 741 F.2d at 827. *Robison,* 266 F.2d at 779. This contention is quite far-fetched, and we have no difficulty in concluding that Barrett satisfied this element of the seaman test. In *Davis v. Hill Engineering, Inc.* 549 F.2d 314, 326 (5th Cir.1977), we affirmed a jury verdict in favor of a welder's helper working on an offshore construction project at the time of his injury. In the course of his work on the project, Davis spent a significant amount of time onshore fabricating pipe in preparation for the construction project. After onshore construction was completed, Davis went to the offshore construction site aboard a derrick barge. Davis was to remain on the barge during the course of the construction phase, an estimated twenty to thirty days. Davis was not called upon to perform maintenance or other chores on the barge. The barge was a special purpose vessel used to transport men, equipment, and material from one location to another and to load and unload equipment. It was also used to lift heavy components into place during the course of offshore construction. Davis assisted in the loading and unloading operations which the court found directly contributed to the special purpose and mission of the barge. Similarly, in this case, the D/B FALCON served as a work space for the fabrication of pipe as well as for transporting materials between the caisson and the barge. By participating in the fabrication of the pipe, Barrett clearly contributed to the specific mission of the D/B FALCON.

It has long been a policy of The Jones Act that its provisions be liberally construed. *Cortes v. Baltimore Insular Line,* 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368 (1932); *Addison v. Gulf Coast Contracting Services, Inc.,* 744 F.2d 494, 501 (5th Cir.1984); *Robison,* 266 F.2d at 780. We conclude that the district court's characterization of Barrett as a seaman is consonant with this purpose.

*The Settlement Agreement.*

Maryland Casualty intervened in this action to claim credit for payments made to Barrett which Maryland characterized as longshoreman compensation benefits. Maryland specifically claims reimbursement against Barrett's settlement proceeds.[6] Maryland made payments to Barrett pursuant to its policy with Tilden over a three-year period. Under the section of the policy entitled "Coverage A: Workmen's Compensation", Maryland was obligated to make payments to injured maritime workers who were entitled to benefits under the LHWCA. Under the section of the policy entitled "Coverage B: Employers' Liability Policy," Maryland was obligated to pay injured maritime workers "transportation, wages, maintenance and

---

5. The fact that the actual duration of Barrett's assignment repairing the caisson was relatively short is of no import. *See Davis, supra,* where the plaintiff spent approximately 85% of his time on shore, but at the time of his injury, was aboard a vessel for a 20 to 30 day assignment at sea. The plaintiff in *Davis* was classified as a seaman because it was the permanency of his connection with the vessel during that particular assignment that was determinative and not the actual duration of the assignment.

6. Maryland contends that as compensation insurer, a compensation lien should automatically attach to Barrett's settlement proceeds. However, Maryland conceded at trial that if Barrett qualified for seaman status, it would not have a lien on the settlement proceeds. Because we have deemed Barrett a seaman, we need not address the question of a compensation lien.

cure" for any bodily injury for which Tilden was liable.[7]

Maryland claims that it made payments to Barrett in its capacity as compensation insurer under "Coverage A" of the policy, and not as Jones Act insurer. As indication of this intent, Maryland points out that many of the checks sent to Barrett were marked "Workmen's Compensation Insurance." Maryland also points out that under "Coverage B", the Jones Act portion of the insurance policy, Maryland was only obligated to pay benefits up to $25,000. Because Maryland had made payments in excess of this limitation, Maryland argues that its intention to make payments as longshoreman compensation insurer was clearly demonstrated.

■ As Tilden's insurer, Maryland was obligated to make payments to injured workers regardless of their classification as longshoremen or seamen. The question of whether a maritime worker is a Jones Act seaman is normally one of fact, and frequently the status of the maritime worker will not be known until the issue is litigated. *See Longmire v. Sea Drilling Corp.*, 610 F.2d 1342, 1345 (5th Cir.1980). If Maryland had not waived rights to reimbursement in the capacity of Jones Act insurer, it would actually have been to its benefit for Barrett to be characterized as a seaman because the applicable portion of the insurance policy was subject to a limitation of liability. But we need not address any question of rights Maryland may have had to seek reimbursement in the absence of a settlement agreement. The fact remains that Maryland chose to waive certain rights under the settlement agreement. Its claim that the result in this case is unfair is belied by its own knowledge of the seaman status issue which was posed by the terms of its insurance policy. Because Maryland made the wrong decision as to seaman status it cannot shift the burden of that erroneous decision to others as it is trying to do in this case.

■ As a seaman, Barrett was not entitled to the benefits of the LHWCA. *McDermott, Inc. v. Boudreaux*, 679 F.2d 452, 454 (5th Cir.1982), *Bodden v. Coordinated Caribbean Transport, Inc.*, 369 F.2d 273, 274 (5th Cir.1966). Any benefits he received from Maryland must thus be characterized as recovery under the "Coverage B" section of the policy. It is true that under the Jones Act portion of the policy, Maryland's liability was limited to $25,000, but under the clear terms of the settlement agreement, Maryland had waived all rights to reimbursement of benefits paid to Barrett.

AFFIRMED.

E. GRADY JOLLY, dissenting:

Case by case, plaintiff by plaintiff, we dilute the requirements to meet seaman status.

It is said here that the plaintiff is "permanently" attached to the FALCON. Yet only on intermittent occasions did it become necessary for the plaintiff to board *any* vessel, much less the specific vessel FALCON, in order to perform his work. Indeed, the facts show that the plaintiff's employer contracted with Chevron to provide maintenance and repair *only* on fixed platforms. His "attachment" to a vessel, when it briefly occurred, did not even relate to the amount of time necessary to complete a project, but rather related to the number of days of his particular work hitch. At the end of his several-day work hitch, he almost always said his goodbyes to whatever vessel he left, if any, because he was not likely to return since his new assignment was usually to another platform. In such new assignment, it was very probable that no barge, much less the FALCON, awaited him because seventy to eighty percent of his work was performed on platforms large enough not to require a vessel to provide the space for work. The majority seems to ignore this fact by failing to evaluate the nature and quality of the plaintiff's work assignment over the course of his employment; rather, the majority concludes that he is "permanently attached" by evaluating his work assignment on *only one* of many work hitches. And so we find that the plaintiff's eight-day association with the FALCON is "permanent." Someone has been away from a dictionary too long.

---

**7.** Maryland's standard insurance policy was amended to include these maritime provisions. An amendment under the "Coverage A" extended coverage that section to workers entitled to recover under the LHWCA. The "Coverage B" section was amended to include recovery for Jones Act seamen.

Second, it is said by the majority that the plaintiff "contributed to the mission of the FALCON"—to be sure, any contention to the contrary is called "far-fetched." So how is the mission defined: the mission of the vessel, the opinion states, was to provide work space for the plaintiff and to transport materials between the caisson and the barge. Yet the plaintiff, as a welder's helper, clearly had no responsibilities for transporting materials from the caisson to the FALCON; nor did he have any responsibilities whatsoever in the operation of the vessel. The plaintiff was simply to work in the space provided by the vessel. Thus the mission of the vessel was to provide work space for the plaintiff—nothing more—and the plaintiff did nothing to provide space for himself or anyone else, yet he contributed to that already-completed mission of providing space by working in the space provided. I am afraid I do not understand.

Before today, I had never thought that paying passengers aboard a cruise ship "contributed to the mission of the vessel" by occupying the space they had bought for a two-week cruise. Somehow I had never thought that a novelist who writes aboard a cruise vessel during his two-week voyage is a Jones Act seaman. But he may be as "permanently assigned" as Jethro Barrett is here, and he is working in the space provided and thus contributing to the "mission" of the vessel as much as Jethro Barrett is here.

Because I do not ascribe to the word "permanence" the meaning the majority gives it, and because I do not follow the reasoning that the plaintiff contributed to the mission of the FALCON, and because I think it is regrettable to stretch words and logic beyond their reasonable ductility in the name of "liberal construction," I respectfully dissent.

GEE, specially concurring:

While I concur in the majority opinion, I write separately to voice my agreement with the general thrust of the dissent. It is indeed true, as Judge Jolly observes, that recent decisions of our court "dilute the requirements to meet seaman status." Nevertheless, convinced that they are already sufficiently expanded so as to cover Mr. Barrett's circumstances, I concur.

ON SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS and HILL, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the applications for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.